278

KEYBANK NATIONAL ASSOCIATION, Appellee,

v.

MAZER CORPORATION et al., Appellees;

Data Recognition Corporation, Appellant.

[Cite as *KeyBank Natl. Assn. v. Mazer Corp.*, 188 Ohio App.3d 278, 2010-Ohio-1508.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 23483.

Decided April 2, 2010.

Porter, Wright, Morris & Arthur, L.L.P., and James Botti, for appellee KeyBank National Association.

Reinhart Boerner Van Deuren, S.C. and Daniel Kelly; and Christopher Brown, for appellant Data Recognition Corp.

Hollencamp & Hollencamp and Arthur R. Hollencamp, for appellee Chikol Equities, Inc.

FAIN, Judge.

{¶ 1} Intervenor-appellant Data Recognition Corporation appeals from a judgment holding that plaintiff-appellee, KeyBank National Association, holds a first-priority, perfected security interest in 200,000 to 300,000 pounds of paper in the possession of Chikol Equities, the receiver of the assets of the Mazer Corporation.[1]

---

1. For purposes of convenience, we will refer to the involved companies as DRC, KeyBank, Chikol, and Mazer.

{¶ 2} DRC contends that the trial court erred in failing to determine whether DRC owned paper delivered to Mazer and in not ordering the paper returned to DRC. DRC further contends that the trial court erred in limiting its consideration of the law of bailments to express bailments, without also considering implied bailments, in analyzing the respective interests of DRC and Mazer in the paper. DRC also contends that the trial court erred in ordering Chikol to sell the paper, when the record contained no evidence that Mazer either owned the paper or had any right to sell it.

{¶ 3} We conclude that the trial court erred in failing to find in favor of DRC on its bailment claim. DRC submitted evidence of its ownership of the paper and an implied bailment agreement concerning the paper, which was not challenged by Chikol or KeyBank. Chikol and KeyBank also failed to cross-appeal the award of damages to DRC on its cost to cover. Accordingly, that part of the judgment of the trial court adjudicating ownership of the paper is reversed. That part of the judgment awarding damages to DRC and offsetting against that award an invoice for an account that DRC owes to Mazer is affirmed.

I

{¶ 4} For a number of years, Mazer Corporation was engaged in the printing business. In late December 2008, Mazer suddenly closed it doors and laid off its employees, who were located in Dayton, Ohio, and at a facility in Johnson City, Tennessee. Mazer and an affiliated company, ABMD, Ltd. ("ABMD"), also defaulted on approximately $4,777,906 in loans owed to KeyBank.

{¶ 5} In early January 2009, KeyBank filed a complaint against Mazer, ABMD, and National City Bank ("NCB"), alleging that KeyBank possessed a security interest in all of Mazer's personal property assets, due to security agreements and the filing of UCC–1 financing statements. NCB was included as a party that may have an interest in some of ABMD's assets.[2] KeyBank also filed an emergency motion asking for appointment of Chikol as a receiver. The trial court granted the motion on January 7, 2009.

{¶ 6} In mid-February 2009, DRC filed a motion to intervene as a party-plaintiff, claiming ownership in paper delivered to Mazer, in Mazer's possession, pursuant to a bailment arrangement. After being granted permission to intervene, DRC filed a motion for an order directing the receiver to return the property. DRC also filed various unauthenticated documents in support of its claim. KeyBank filed a response, contending that DRC had not yet established either the existence of a written contract of bailment or that the conduct between

---

2. ABMD subsequently declared bankruptcy, and the action in the trial court against ABMD has been stayed.

DRC and Mazer proved the existence of an implied contract of bailment. KeyBank also claimed that DRC had failed to pay a Mazer invoice for a prior order, totaling approximately $15,000.

{¶ 7} Subsequently, in May 2009, the trial court held a hearing on the pending issues. At the hearing, the attorney for the receiver, Chikol, stated that the receiver had approximately 300,000 pounds of paper in the Tennessee facility, which had a value of between $100,000 and $200,000. Counsel for Chikol also noted that DRC owed Mazer $21,000 on an existing invoice. DRC contended at the hearing that the paper had been delivered to Mazer as a bailment and that the pending invoice should be set off by amounts that DRC had paid to cover when Mazer defaulted on a specific printing job (the "Ohio job").

{¶ 8} Three witnesses testified at the hearing. DRC presented testimony from its procurement manager, John Wainwright, regarding the paper that was sent to Mazer and the Ohio job that DRC was attempting to offset against the $21,000 invoice. The receiver's representative, David Kebrdle, testified solely about conversations with DRC about the Ohio job and the receiver's ability to finish that particular job for DRC. A KeyBank vice president, Sally Barton, also testified briefly about a conversation she had with Wainwright about the Ohio job.

{¶ 9} Wainwright indicated that DRC has contractual relationships with 11 different state departments of education, pursuant to which DRC performs various services, including writing test questions (depending on the state), putting together and printing test booklets, distributing the booklets to individual school districts, retrieving the booklets after use, scoring exams, and reporting results to students and the states.

{¶ 10} At the time of the transactions in the case before us, DRC had three certified vendors, including Mazer, who printed test booklets. DRC conducts a thorough certification process, because DRC has a zero-tolerance policy for defective books. In order to certify vendors, DRC performs an extensive background check, and investigates the vendor's quality processes and procedures, security, and equipment. DRC also conducts on-site visits. DRC performed this certification process with Mazer in 2007 and certified Mazer as a vendor.

{¶ 11} Wainwright also testified about customary business practices that DRC follows with all of its vendors, including Mazer. When DRC has a particular printing project, it takes competitive bids from two or three vendors and decides which vendor it will use for the project. When the vendor gives DRC a price, the vendor indicates how much paper is required for the project. Before DRC enters into a relationship with a vendor, it has "up-front" discussions with the vendor about the fact that DRC will buy and provide the paper for the project and will be putting it into the vendor's plant.

{¶ 12} Once DRC obtains the paper requirements from the vendor, DRC places a paper order through a merchant. DRC pays the paper merchant directly for the paper. The merchant then places that particular order with a paper mill, which ships the paper to the particular vendor. The paper is at the vendor's place of business only for the particular job, on a short-term basis. After the materials are printed, the vendor returns the materials to DRC, which combines them with other materials and ships them to the individual states. The unused paper is also delivered to DRC. Wainwright testified that this practice is common in the industry and that all printers and vendors that DRC works with deliver the unused paper to DRC.

{¶ 13} According to Wainwright, this process was followed with Mazer. DRC and Mazer had many discussions about the fact that DRC would supply the paper. For the work that DRC did with Mazer, DRC always purchased the paper and had it delivered to Mazer. Mazer would then deliver the unused paper to DRC when the job was completed. Wainwright also identified and authenticated various documents that were admitted into evidence. These documents consisted of purchase orders from DRC to Strategic Paper, DRC's paper merchant, for specific amounts of paper to be used on various projects. The exhibits also included detailed roll lists of paper and bills of lading generated by the paper mills when the mills shipped the paper to Mazer. These documents include several hundred thousand pounds of paper that was shipped to Mazer in late November and December 2008, for seven state projects (two South Carolina projects, and projects for Pennsylvania, Oklahoma, Washington, Ohio, and Alaska). The purchase orders indicate approximately $212,122 in costs for the paper that was sent to Mazer. No testimony or documentary evidence was offered to dispute DRC's evidence about the agreements and course of conduct and dealing followed by DRC and Mazer.

{¶ 14} There was also no dispute about the fact that DRC owed Mazer approximately $21,200 on an account receivable unrelated to the Mazer closing. Wainwright testified that this amount should be offset by approximately $44,000 that DRC paid to complete the Ohio project. As of the date Mazer closed, the paper for the Ohio project had actually been printed and had come off the printing press. Wainwright indicated that the process was one-third complete at that point. The booklets still had to be bound, and each book would have to be individually injected with a bar code. In addition, the books had to be shrink-wrapped with a sheet identifying the numbers of the books in the package.

{¶ 15} DRC was notified on December 31, 2008, that Mazer was closing. This was the actual date the doors closed. The New Year's holiday then intervened. By Friday, January 2, 2009, DRC was investigating whether the Ohio project should be outsourced to another vendor. DRC was concerned about getting

materials delivered on time to meet state contract deadlines, which DRC is required to meet. The states set up testing-time formats, and DRC is required to deliver materials to school districts a minimum of two weeks before testing begins. Failure to meet deadlines could result in penalties and loss of customers. The product also had to be completed with zero defects. DRC had issues that needed to be resolved before allowing Mazer to finish the project, such as knowing that the people running the project were properly trained, that quality control would be in place, and what recourse DRC would have if the product were delivered with defects.

{¶ 16} Another concern was plant security. A plant has to be a secure facility, door access has to be limited, and employees have to have passkeys. DRC had concerns about the company closing and employees being angry or upset. In fact, DRC had learned of a break-in at the plant on December 31, 2008, during which people had vandalized the property. In making the decision to re-source and cover, Wainwright was concerned about the time it would have taken to ensure that Mazer was still able and certified and secure to perform. Wainwright also indicated that the decision to re-source was made because he could not get information that was reliable. DRC was additionally under a very tight deadline. Wainwright had already decided to re-source the project by January 6 or 7, 2009, or approximately when the receiver was appointed. DRC used one of its other certified vendors to complete the Ohio project.

{¶ 17} Because the paper for the Ohio project had been printed, DRC had to replace the paper in order to complete the project. The original cost of the paper for this particular project was $44,460, and the new paper that was ordered cost approximately the same amount. DRC, therefore, concluded that it was entitled to offset this amount against the $21,200 invoice.

{¶ 18} Kebrdle testified that he believed that the receiver could have finished the project if it had been given the opportunity. Kebrdle stated that the receiver contracted with some Mazer ex-employees and was able to finish a Florida test project that was partially completed. Kebrdle stated that he talked with Wainwright fairly early in January. He also spoke to DRC's attorney, Amanda Gibbs, and offered to finish up some or all of DRC's jobs. Gibbs told Kebrdle that the material had already been re-sourced.

{¶ 19} KeyBank's vice president, Barton, also testified that she had talked with Wainwright, as well as numerous other customers, within a few days after Mazer closed. Her response to anyone's questions was that KeyBank had been locked out of the facilities and was attempting to take court action to get a receiver in place. Barton told Wainwright and others that KeyBank would be in touch as soon as that was done for the purpose of trying to finish the jobs and maximize the assets.

{¶ 20} After hearing the evidence, the trial court took the matter under advisement. The court then issued a decision holding that no contract of bailment existed. The court noted that DRC had never asserted that a written contract existed and that Wainwright had asserted instead that an oral contract existed. After citing case law pertaining to the requirement that parties to a contract must have a common and distinct intention that was communicated to each other, the court held, without elaborating upon its reasoning, that DRC had failed to establish a contract of bailment by a preponderance of the evidence. The court therefore held that KeyBank's lien was paramount.

{¶ 21} The trial court further held that DRC was entitled to damages of $43,300.98 with regard to its costs to cover and offset that against the $21,200.98 due to the receiver on the prior outstanding invoice. The court then held that DRC was entitled to be paid the remainder of its damages ($22,000) from the net proceeds of the sale of the paper.

{¶ 22} DRC appeals from the judgment of the trial court.

## II

{¶ 23} DRC's First Assignment of Error is as follows:

{¶ 24} "The trial court failed to determine whether Data Recognition Corporation ('DRC') owns certain paper delivered to Mazer Corporation ('Mazer') for printing services and consequently erred in not ordering the paper returned to DRC."

{¶ 25} Under this assignment of error, DRC contends that the trial court committed an error of law because it never determined the ownership of the paper. According to DRC, the trial court incorrectly characterized the motion for return of its property as being predicated upon a claim of ownership that depended on an alleged bailment agreement between DRC and Mazer. DRC contends that this misapprehends the relationship between ownership and bailment, in that a bailor's bailment of property depends upon the bailor's ownership interest in the property, not vice versa.

{¶ 26} KeyBank contends that in order to reject a bailment relationship, the trial court necessarily determined that Mazer's receiver, Chikol, owned the paper. Chikol additionally argues that DRC failed to present evidence that it paid for the paper or that the paper was delivered to Mazer. DRC contends that Chikol waived this issue, because it failed to raise the matter in the trial court. We agree with DRC.

{¶ 27} Prior to the hearing, Chikol indicated in reports to the trial court that DRC had taken its printing work elsewhere and had left Chikol with a large stockpile of paper. This is inconsistent with contentions that DRC failed to

purchase the paper or that the paper was not delivered to Mazer's plant. DRC could not leave something that had not been delivered, nor would it abandon something that it owned and wanted returned.

{¶ 28} Furthermore, Chikol failed to contend at the hearing that anyone besides KeyBank and DRC claimed a right to the paper. Counsel for Chikol told the trial court that approximately 300,000 pounds of paper was at Mazer's facility and that a dispute had arisen between KeyBank and DRC, in that KeyBank claimed to have the "line" on the paper due to its blanket UCC filing. Counsel for Chikol further noted that DRC claimed to be entitled to the paper based on either bailment or consignment. No questions were raised, however, about payment or delivery of the paper. The issues as outlined at trial were whether DRC could establish an express or implied bailment or a consignment that would take precedence over KeyBank's security interest and whether an offset should be given to DRC for the prior invoice, based on DRC's cover, or cure, of Mazer's default on the Ohio project.

{¶ 29} DRC's witness, Wainwright, testified that DRC paid for the paper, which was shipped by paper mills to Mazer's facility in Tennessee. No one disputed this evidence during the hearing, although both KeyBank and the receiver cross-examined Wainwright on various matters related to DRC's decision to cover and re-source the Ohio project rather than have the receiver finish the job. Furthermore, none of the bills of lading indicate that the paper product was sold to Mazer or that Mazer was invoiced for payment. The bills of lading are consistent with Wainwright's testimony that DRC placed orders with its paper merchant, who then arranged for product to be shipped from various paper mills to Mazer. The bills of lading and invoices do not indicate that the material is being sold to Mazer, nor do they contain payment terms indicating that payment is to be made by Mazer at delivery. Instead, the bills of lading state that the product is being "sold" to other parties and is merely being shipped to Mazer.

{¶ 30} Chikol also failed to introduce any invoices indicating that Mazer had been billed for the paper. Furthermore, a number of the bills of lading contain notations such as "prepaid" or "to be prepaid." In short, Mazer's receipt of the paper and DRC's payment for the paper were not contested issues in the trial court.

{¶ 31} "A bailment has been defined as the delivery of goods or personal property by one person to another in trust for a particular purpose, with a contract, express or implied, that the property shall be returned once the purpose has been faithfully executed." *Collins v. Click Camera & Video, Inc.* (1993), 86 Ohio App.3d 826, 830, 621 N.E.2d 1294.

{¶ 32} Three classes of simple contracts exist: "express, implied in fact, and implied in law." *Legros v. Tarr* (1989), 44 Ohio St.3d 1, 6, 540 N.E.2d 257. " '[A]n express contract connotes an exchange of promises where the parties have communicated in some manner the terms to which they agree to be bound.' *Ford v. Tandy Transp., Inc.* (1993), 86 Ohio App.3d 364, 380[, 620 N.E.2d 996]. 'A contract is generally defined as a promise, or a set of promises, actionable upon breach. Essential elements of a contract include an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and of consideration.' *Perlmuter Printing Co. v. Strome, Inc.* (N.D.Ohio 1976), 436 F.Supp. 409, 414." (Citations omitted.) *LaPoint v. Templeton*, Fulton App. No. F–07–014, 2008-Ohio-1792, 2008 WL 1700522, at ¶ 24.

{¶ 33} "However, where oral contracts are concerned, the 'terms of an oral contract may be determined from "words, deeds, acts, and silence of the parties." ' " Id. at ¶ 25, quoting *Kostelnik v. Helper*, 96 Ohio St.3d 1, 2002-Ohio-2985, 770 N.E.2d 58, at ¶ 15, quoting *Rutledge v. Hoffman* (1947), 81 Ohio App. 85, 36 O.O. 405, 75 N.E.2d 608, paragraph one of the syllabus. " '[S]eldom, if ever, does the evidence in proof of an oral contract present its terms in the exact words of offer and acceptance found in formal written contracts. And no such precision is required. It is sufficient if the intent is disclosed by word, deed, act, or even silence.' * * * Therefore, while mutual assent is usually manifested by offer and acceptance, in oral contracts, mutual assent may be manifested by other acts or failures to act." *LaPoint*, 2008-Ohio-1792, 2008 WL 1700522, at ¶ 25, quoting *Rutledge v. Hoffman*, 81 Ohio App. at 86.

{¶ 34} Similarly, "[a] contract implied-in-fact is a contract inferred from the surrounding circumstances, including the conduct and statements of the parties, which lead to a reasonable assumption that a contract exists between the parties by tacit understanding." *Wilson v. Street*, Montgomery App. No. 22768, 2009-Ohio-2328, 2009 WL 1393273, at ¶ 11.

{¶ 35} In the case before us, it is undisputed that the parties did not sign a written agreement for return of the property. DRC thus had to prove either of the following items: (1) an express oral agreement for return of the property, bearing in mind that mutual assent in such situations may be manifested by words, deeds, or even silence, or (2) an implied contract for return of the property, in which the surrounding circumstances, including the parties' statements and conduct, lead to a reasonable assumption that a contract exists by tacit understanding.

{¶ 36} We have previously held that "[t]he determination of whether a contractual offer and acceptance have occurred is a factual question. * * * 'A

factual finding of the trial court will be reversed only if it is found to be against the manifest weight of the evidence.'" *Wilson,* 2009-Ohio-2328, 2009 WL 1393273, at ¶ 11, quoting *Zeefe v. Zeefe* (1998), 125 Ohio App.3d 600, 709 N.E.2d 208. In assessing a manifest-weight challenge in the civil context, judgments will not be reversed as being against the manifest weight of the evidence where they are "'supported by some competent, credible evidence going to all the essential elements of the case.'" *Gevedon v. Ivey,* 172 Ohio App.3d 567, 2007-Ohio-2970, 876 N.E.2d 604, at ¶ 54, quoting *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus.

{¶ 37} After citing case law indicating that parties to a contract must have a common and distinct intention that is communicated to each other, the trial court held, without elaborating upon its reasoning, that DRC had failed to establish a contract of bailment by a preponderance of the evidence. The court's decision is not supported by the weight of the evidence.

{¶ 38} The only evidence presented to the trial court was that DRC and Mazer had discussed many times that DRC would supply the paper for printing projects and that Mazer would return the unused paper after printing each particular job. DRC's procurement manager testified that DRC followed this course of conduct with all vendors, including Mazer. The procurement manager also said that Mazer had always returned the paper after completing a project. In addition, DRC presented documentary evidence supporting DRC's version of events. Because no evidence was presented to counter this evidence, the trial court's finding is not supported by competent, credible evidence. Compare *Circuit Solutions, Inc. v. Mueller Elec. Co.,* Lorain App. No. 07CA009139, 2008-Ohio-3048, 2008 WL 2485157, at ¶ 28 (noting that the trial court's finding that a contract did not exist was not supported by competent, credible evidence, where the evidence about the contractual arrangement was not disputed).

{¶ 39} KeyBank contends that by rejecting bailment, the trial court must have found that the receiver, Chikol, owned the property. KeyBank bases this contention on the legal concept that possession of property operates as a superior claim to title against anyone not having a better ownership interest in the property.

{¶ 40} As a general proposition, we agree with this statement. We have previously stated that possession of property creates a rebuttable presumption of ownership. *Rowland v. Parkfair Motel Co.* (Mar. 25, 1981), Clark App. No. 1495. However, there was no contention at the hearing that the receiver was entitled to the unused paper; the issue at trial was whether DRC would be able to claim a setoff against the invoice and, if so, how much the setoff would be. Furthermore, DRC rebutted any presumption of ownership through possession, and neither KeyBank nor Chikol presented evidence to challenge DRC's evidence.

{¶ 41} Furthermore, as DRC points out, it is well established that "[b]ailment involves the transfer of a possessory interest only and not an ownership interest in property." *Tomas v. Nationwide Mut. Ins. Co.* (1992), 79 Ohio App.3d 624, 629, 607 N.E.2d 944. Accord *Scherer v. Owners Ins. Co.,* Summit App. No. 23995, 2008-Ohio-2675, 2008 WL 2267030, at ¶ 18, and *Long v. Noah's Lost Ark, Inc.,* 158 Ohio App.3d 206, 2004-Ohio-4155, 814 N.E.2d 555, at ¶ 41. The trial court, therefore, also erred to the extent that it implied that DRC's ownership of the paper is premised on the bailment claim. In order to create a bailment, DRC had to first own the property. It could then transfer possession temporarily to Mazer, pursuant to the bailment.

{¶ 42} Mazer's possession of the paper is also not inconsistent with DRC's ownership of the paper. In fact, it is entirely consistent with the existence of a bailment relationship between DRC and Mazer. The trial court's award of approximately $44,000 to DRC for its cost in curing Mazer's default on one of the pending projects (the Ohio project) is also inconsistent with a finding that DRC did not own the paper. If DRC did not purchase and own the paper, there would have been no reason for the trial court to conclude that DRC is entitled to reimbursement for paper it had to purchase to complete the project.

{¶ 43} DRC's First Assignment of Error is sustained.

## III

{¶ 44} DRC's Second Assignment of Error is as follows:

{¶ 45} "Because the trial court applied only the law of express bailments, and not implied bailments, to the relationship between DRC, Mazer, and the paper DRC shipped to Mazer, the trial court erroneously concluded no bailment existed. Based on that error, the trial court refused to order Mazer to return DRC's paper."

{¶ 46} Under this assignment of error, DRC contends that the trial court should have applied the law of implied bailment and should have ordered the return of the paper to DRC. KeyBank contends that DRC failed to establish by a preponderance of the evidence that an implied bailment existed, because Mazer was not a party to the purchase orders submitted in evidence and because DRC failed to offer testimony from a Mazer representative attesting to the bailment relationship. We disagree with KeyBank.

{¶ 47} "The elements of an implied contract are the same elements as an express agreement; there must be a definite offer, acceptance, and consideration. * * * 'An implied contract is a contract inferred by a court from the circumstances surrounding the transaction, making it a reasonable or necessary assumption that a contract exists between the parties by tacit understanding.' " *Cohen*

*v. G/C Contracting Corp.*, Greene App. No. 2006 CA 102, 2007-Ohio-4888, 2007 WL 2743707, at ¶ 42, quoting *Criner v. Urologic Physicians & Surgeons, Inc.* (Dec. 15, 2000), Greene App. No. 2000–CA–28, 2000 WL 1838281.

{¶ 48} In the case before us, DRC presented evidence that the parties had a bailment relationship. The invoices support DRC's position. Mazer was not required to be a party to the purchase orders for the paper, because Mazer did not pay for the paper. DRC paid for the paper, through its paper merchant, and had the material shipped to Mazer. Furthermore, DRC met its burden of proof by introducing evidence of its agreement with Mazer and of the course of conduct between the parties. Because no contrary evidence was presented, there was no reasonable basis for the trial court to reject the existence of a bailment relationship.

{¶ 49} DRC's Second Assignment of Error is sustained.

## IV

{¶ 50} DRC's Third Assignment of Error is as follows:

{¶ 51} "The trial court erred when it ordered Mazer's receiver to sell the unused paper when there was no evidence in the record that Mazer either owned the unused paper or had any other right to sell it."

{¶ 52} Under this assignment of error, DRC contends that the trial court erred in ordering Chikol to sell the unused paper, because the record is devoid of any evidence that Mazer had any right, title, or interest in the paper. We agree, based on our discussion of the first two assignments of error.

{¶ 53} In responding to this assignment of error, KeyBank argues that DRC's request for a return of the paper or the full purchase price of the paper is moot because DRC failed to obtain a stay of the trial court's decision. According to KeyBank, the paper has been sold and the proceeds have been placed in escrow pending appeal. DRC points out that the receiver sold the paper after DRC had filed its notice of appeal and a motion for stay of the sale. DRC claims that the receiver accelerated the sale in order to accomplish the sale prior to the time a hearing could be held on DRC's motion for stay. The statements of the parties indicate that these matters occurred after the judgment that is on appeal, and they are not properly before us.

{¶ 54} The right to appeal is not conditioned upon obtaining a stay of the judgment from which the appeal is taken. A party who cannot afford the requisite supersedeas bond, or who is otherwise unable to obtain a stay of the offending judgment—perhaps, as in the case, because the party loses the race between the appellant's attempt to obtain a stay and the appellee's attempt to reduce its judgment to money, does not thereby lose the right to appeal. A *voluntary* satisfaction of a judgment waives any appeal from that judgment.

*Blodgett v. Blodgett* (1990), 49 Ohio St.3d 243, 245, 551 N.E.2d 1249, citing *Rauch v. Noble* (1959), 169 Ohio St. 314, 8 O.O.2d 315, 159 N.E.2d 451, and *Lynch v. Lakewood City School Dist. Bd. of Edn.* (1927), 116 Ohio St. 361, 156 N.E. 188. There was nothing voluntary, from DRC's point of view, about the receiver's decision to satisfy KeyBank and other lien holders by selling the paper and applying the proceeds from the sale. In this respect, this case is similar to *Bob Krihwan Pontiac–GMC Truck, Inc. v. Gen. Motors Corp.* (2001), 145 Ohio App.3d 671, 763 N.E.2d 1253, in which General Motors Corporation, having obtained a judgment that it was entitled to rescind a franchisee's franchise, proceeded to do so. The fact that the franchisee was unable to obtain a stay of execution in that case did not render the franchisor's termination of the franchise voluntary from the point of view of the franchisee.

{¶ 55} Where a judgment is reversed, the successful appellant is entitled to a judgment of restitution for all that he or she has lost because of the judgment. *Portis v. Summit Cty. Bd. of Elections* (1993), 67 Ohio St.3d 590, 621 N.E.2d 1202; *Bickett v. Garner* (1876), 31 Ohio St. 28, paragraph one of the syllabus; see also *Hiler v. Hiler* (1880), 35 Ohio St. 645. In the case before us, because title to the paper may have passed to an innocent third-party purchaser, and because the value of the paper that has been lost to DRC as a result of the judgment we are reversing may be the subject of a factual dispute, we leave it to the trial court, on remand, to consider the amount of restitution to award.

{¶ 56} We do note that neither Chikol nor KeyBank has cross-appealed the $43,300.98 award that DRC was given for its costs to cover the Ohio project, which was offset against the $21,200.98 due to the receiver on the prior outstanding invoice. Accordingly, that portion of the judgment is affirmed. We note that DRC cannot make a double recovery on remand for this particular item (the Ohio project).

{¶ 57} DRC's Third Assignment of Error is sustained.

V

{¶ 58} All of DRC's assignments of error having been sustained, the judgment of the trial court is reversed in part and affirmed in part. The judgment in favor of DRC as to its damages for the Ohio project, and the offset of those damages against the prior invoice owed to Mazer, is affirmed. The remainder of the judgment is reversed, and this cause is remanded for further proceedings consistent with this opinion.

Judgment affirmed in part
and reversed in part,
and cause remanded.

BROGAN and FROELICH, JJ., concur.