[Cite as *In re J.H.-P.*, 2012-Ohio-638.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

IN RE:                                             :

                                                          :          Appellate Case No.   24683

          J.H.-P.                                  :

                                                          :          Trial Court Case No. JC2008-1299

                                                          :

                                                          :

                                                          :          (Juvenile Appeal from

                                                          :           Common Pleas Court)

                                                          :

. . . . . . . . . .

# O P I N I O N

Rendered on the 17th day of February, 2012.

. . . . . . . . . .

CHERYL WASHINGTON, Atty. Reg. #0038012, 130 West Second Street, Suite 450, Dayton, Ohio 45402
          Attorney for Appellant

D.P.
          Appellee, *pro se*

. . . . . . . . . . . .

FAIN, J.

{¶ 1}   Appellant C.H. appeals from an order of the Montgomery County Common Pleas Court, Juvenile Division, overruling her motion to terminate visitation-parenting time between her minor child and the child's father, D.P.   The mother contends that the trial

court's decision to permit the father to exercise unsupervised visitation with the child is against the manifest weight of the evidence. She argues that the evidence in the record proves that the father had sexually abused the child, and that the trial court's finding that the father had not abused the child is against the manifest weight of the evidence.

{¶ 2}   We conclude that there is evidence in this record to support the trial court's finding that the father did not abuse the child, and that this finding, and the order of standard visitation based upon this finding, is not against the manifest weight of the evidence. Accordingly, the order from which this appeal is taken is Affirmed.

I

{¶ 3}   C.H. and D.P. are the unmarried parents of a child born June 18, 2006. Paternity was eventually established, and in December 2008, the father filed a motion seeking visitation-parenting time with the child. The matter was set for hearing and a guardian ad litem was appointed. The GAL submitted a report in which she stated that the mother believes that the father is unable to "protect the child from everyday safety issues," and fears that the father has "either molested the child or exposed the child to pornographic materials that have caused the child to act out inappropriately." The GAL recommended that the father be allowed supervised visitation at Erma's House for three months followed by visitations supervised by his then-current girlfriend.

{¶ 4}   In February 2009, the parties were present with counsel at a pre-trial hearing before a magistrate. At that time, they entered into an agreement regarding the father's parenting time. The agreement, which was set forth in the magistrate's decision, provided

that the father would go to Erma's House for weekly visitation for a period of three months. After that, he could begin weekly visits lasting three hours, which would be supervised by his girlfriend. During that same time, the father would also have visitation with the child on alternate Saturdays from 4:00 p.m. to 7:00 p.m., also supervised by his girlfriend. After a six-month period, the father would then be entitled to parenting time-visitation in accordance with the Montgomery County Standard Order of Parenting Time.

{¶ 5} The mother filed objections to the decision containing the agreed order on parenting time. The trial court overruled the objections. The mother then filed a motion to terminate the father's visitation, based upon her assertion that she feared he would sexually abuse the child if he were permitted to have unsupervised visitation.

{¶ 6} At the two-day hearing on her motion, the mother testified that during the first year of the child's life, she permitted the father to visit with the child in her presence. She testified that during that time, she observed the father leave the child unattended on a bed when she was only three months old. She testified that the child had been born with a medical condition that made swallowing difficult, which caused her to take a course in CPR. The mother testified that when she asked the father to take a CPR course with her, he refused.

{¶ 7} The mother also testified that she observed an incident, in the Spring of 2007, during which the father permitted the child to put her hand near a fan. She testified that at some point, the father had a BB gun that he refused to put away so that the child could not get to it.

{¶ 8} The mother then testified that when the child was about one year old, she observed the father take her into the restroom with him while he urinated. She also testified

that when the child was nine months to one year old, she observed him show the child a "Girls Gone Wild" videotape. She also stated that the father had once permitted the child to look at a "sexual massage book."

{¶ 9} In June 2007, the child had thrush, or a yeast infection, in her mouth. The mother testified that this yeast infection occurred one week after she observed the father take the child into the restroom with him while he urinated. She testified that she informed the father that it was inappropriate to take the child into the restroom with him.

{¶ 10} In October or November of 2007, the mother took the child to see the father at his residence, which he was remodeling. She testified that the father was pulling up carpet and tack strips, and that there were carpet tacks on the floor. When she told the father that the child could step on them, he told her to sweep them up – which she did. She also testified that during that visit, she had asked the father to close an open window, but he refused. The mother testified that she got distracted and the child "had scooted [a tool box] over to the window and had climbed up on it and was on the ledge of the window." She testified that she and the father "both saw it at the same time and ran to her." The mother testified that she observed the father let the child near a stack of chairs that could have fallen on her.

{¶ 11} During this time frame, while the father was visiting at the mother's home, he handed her his camera and asked her to take a picture of him with the child. According to the mother, she had been changing the child's diaper at the time, when the child got up and ran away. The mother said she would take the picture once she finished diapering the child, but the father grabbed the child and said to take the picture because he had to leave. The mother testified that she went ahead and took the picture despite the fact that it made her feel "really

weird," because she knew that he would give her a copy. The mother testified that she also took another picture on one occasion when the father was changing the child's diaper and he kissed the child's rear end.[1]

{¶ 12} The mother testified that beginning in June 2008, the father again took the child to the restroom with him three or four times. She testified that they would be in the restroom a "little longer than I go." She testified that he "threatened" her, and she "froze" when he took the child to the restroom. She further testified that her mother had also observed the father attempt to take the child to the restroom.

{¶ 13} The mother testified that some time between July and August of 2008, she was getting out of the shower when the child came into the bathroom and attempted to put her mouth on the mother's vagina.

{¶ 14} According to the mother, she took the child to the hospital on September 7, 2008, where the child was diagnosed with a urinary tract infection. She then took the child for follow-up to her pediatrician. The mother testified that September 28, 2008, was the last time she and the child were with the father outside of Erma's House. She testified that, at that point, she became worried that the father had sexually molested the child. She contacted the police, Children's Services and the father's pastor.

{¶ 15} The mother began taking the child to a therapist in November 2008; they attended six sessions until February 2009. She then changed therapists and began seeing Wendy Franck, a therapist from Samaritan Behavioral Health. Franck came to the mother's

---

[1] A review of these pictures shows that in one, D.P. is kissing the side of the child's hip. The other picture shows him holding the child up to the side of his face and kissing the side of the child's buttock.

house for the weekly sessions and engaged the child in "play therapy." The mother testified that during one session, the child mentioned the word "bobo," and was trying to draw a picture of "bobo." According to the mother, the child was "very frustrated," so the mother drew a picture for the child and the child "immediately" put her finger on the penis depicted in the picture. The mother also testified that the child was very aggressive with a "daddy doll" on several occasions during therapy.

{¶ 16} According to the mother, she attended the February 9, 2009 hearing before the magistrate with her counsel. However, she testified that she did not agree to the visitation/parenting time that was alleged to have been the result of the parties' agreement.

{¶ 17} Wendy Franck testified that she is a licensed professional counselor who deals with young children. She has a Bachelor's of Art Degree in psychology and a Masters of Arts in Community Counseling. She testified that she works with Samaritan North, which is where the referral for counseling was made; however, she typically conducts therapy sessions in the homes of her patients.

{¶ 18} Franck began counseling the child in March 2009, at which time she decided to use "play therapy" during their weekly therapy sessions. Play therapy, according to Franck, consists of engaging children who "are not verbal enough to explain themselves" in play time with books, dolls, blocks and other toys in order to have them be "more apt to talk about what is going on."

{¶ 19} Franck testified that at the initial intake appointment, the child was "pretty anxious" and wanted to breast feed "a lot during the session." She also testified that she and the mother typically spelled things when discussing the child or the mother's concerns in front

of the child. She testified that the mother was present during the sessions when the child was "looking for security and reassurance." Otherwise, the mother was not usually in the same room with Franck and the child.

{¶ 20} According to Franck, she and the child would play with dolls and she would ask the child which doll was "mommy" and which doll was "daddy." Then Franck would "follow her play, just kind of observe what she was doing and kind of, you know, [ask] 'what are they doing now? What happens next? That kind of stuff."

{¶ 21} Nothing during the initial sessions caused Franck any concern. But in "June or July," the child made a comment in front of her and the mother "about daddy peeing in her face." According to Franck, the child then "kind of shut down and wouldn't talk anymore, [and] crawled in [the mother's] lap and cried." She testified that "later on, that [type of comment] popped up more often."

{¶ 22} When asked about "the next thing that caused [her] some concern," Franck stated:

There was some playing with the doll house and doing typical play in the doll house with having snacks, playing games, that kind of thing, just typical things that would happen during a visit or any time during a typical day with the kiddo. Introduced the bathroom situation, and she would get upset with the bathroom being introduced.[2]

She would become more aggressive with the toys. She would shake the doll house, refuse to talk about it. Would flat refuse to do what was being asked of her. Crawled

---

[2] It is not clear from the testimony what the "bathroom situation" is, but it appears that Franck would suggest to the child that "someone's got to go use the bathroom," and someone would take a doll through the motions of using a restroom.

away, start the baby talk, that kind of thing.

{¶ 23} Franck testified that the girl exhibited a fear of the bathroom itself, as demonstrated by her expressions of "aggression, the crying, the acting out, crawling behind the couch or the chair, refusing to talk, the baby talk, the whimpering."

{¶ 24} Franck also testified that the child made "several more comments during the summer about peeing in the face," and that she talked about a nightmare of a "tiger peeing in her face."

{¶ 25} Franck testified that during one session, she was "trying to process [the child's] feelings regarding what her fear was of the bathroom," and the child used the word "bobo." According to Franck, the child "saw 'bobo' in the bathroom numerous times." However, the child was not able to explain who "bobo" was. Franck testified that the mother then "spontaneously" drew a picture with a penis, and the child pointed to the penis. She also made a comment about "blow me a dog." Franck testified that when she asked the child what she meant, the child "basically, in her terms, explained – explained oral sex. Kissing, licking, touching. And she said when she kissed bobo, he peed in her face."

{¶ 26} Franck stated that there were other comments involving "daddy peed on her pee pee," and about having hers and daddy's clothes off. Franck also stated that the child "made comments about it being black, about it getting bigger." Franck stated that the mother was in the room when the child made these disclosures. Franck testified that at one point the child "had the girl doll and was putting her thumb in the private area and kind of rubbing it. And said that had been done to her by dad. I think it was at his house. And it hurt. She asked him to stop, and he wouldn't stop." Franck testified that the child would also show

aggression toward the "daddy doll," and that she said "that daddy was bad, and daddy had made some bad choices." Franck testified that "recently" the child made comments "about daddy hurting her, daddy biting her, her arms and her legs." Franck testified that she did not think that the mother had coached the child because the child's "responses are spontaneous, not rote in nature."

{¶ 27} Franck further testified that there are six indicators that she looks for when someone alleges sexual abuse. Specifically she testified that she looks for the following:

One would look for nightmares, bed wetting, that kind of thing. Regression in behavior. Statements that they make. A change in their interactions with – with the adults. Sematic [sic] complaints, would she complain of stomach aches on occasion. There are six indicators, and I can't think of the last one.

{¶ 28} Franck testified that the child had exhibited nightmares, changes in sleep patterns, acting out and aggressive behavior, and a stomach ache.

{¶ 29} Franck testified that the child will "go back and forth between saying she's scared of dad, and then she's not scared of dad. She's indicated throughout the time that she enjoys visitation with dad, talk about them playing with dinosaurs, drawing pictures, having a good time. That when she leaves the visit, she missed dad. Other times she will say she's scared."

{¶ 30} On cross-examination, Franck first testified that she was not treating or diagnosing the child, but rather stated that her role was to enable the child to "be able to talk about her relationship with her dad so that she could process the feelings regarding that." She further testified that she had handled "maybe two or three" sexual abuse cases in the past, and

that she currently had "several that are alleged. Nothing's been substantiated." Franck testified that she had never observed the child's interactions with the father. She testified that "several times," when questioned about "Bobo," the child pointed to the face, nose and belly button. She testified that occasionally the child would say that daddy had peed in her face and then would say that it did not happen. Franck then testified that she, with the help of her supervisor, had given the child a diagnosis of "adjustment disorder with mixed conduct and emotions."

{¶ 31} Franck admitted that in her notes, her goals for the child's therapy did not contain any reference to sexual abuse, but rather were to have the child "speak freely of facts/feelings regarding possible distress in her relationship with her father." Franck indicated that she is required to report allegations of abuse and that she had made a report to Children's Services.

{¶ 32} On redirect examination, the mother's attorney asked Franck whether one of her initial assessment goals was to "rule out sexual abuse." Franck responded affirmatively and stated that "in my mind, if it occurred, the story would be told. If there was nothing there, the story would not be told."

{¶ 33} Linda Fenner, a caseworker at Montgomery County Children Services, testified that she is one of five workers assigned to "interview sexual abuse and prosecutable physical abuse cases that are referred to Montgomery County." Fenner testified that she had performed "probably close to a hundred" such interviews and that "at least fifty percent" of them had involved sexual abuse. She testified that she has a Bachelor's Degree in sociology and psychology, and was two days short of completing her Master's Degree in social work. She

testified that she had taken a course in forensic interviews. She testified that she had previously worked as a primary counselor at Saint Joseph's Treatment Center, where she engaged in play therapy with children on a daily basis.

{¶ 34} According to Fenner, the first referral information she received was in October 2008, and that the mother "talked about the father exposing [the child] to dangerous and unsafe situations. She talked about they had met with father's pastor to talk about some of these things. She had concerns that he had exposed [the child] to pornography and other inappropriate things. There was an incident [when the child attempted to put her mouth on the mother's vagina] that she reported of behavior, but the allegation at that time wasn't of sexual abuse." Fenner testified that after that time there "were other calls that were made to the Agency," and that the "Agency's final call that resulted in a referral and for us to begin looking at it, was in October of this year, of '09."

{¶ 35} Fenner conducted a forensic interview, viewed by a detective, and stated that the child made no disclosures to her. According to Fenner, the "last incident of [alleged] sexual abuse would have happened when [the child] was eighteen months old." Fenner testified that it is standard practice to not ask leading questions of the child, but because the child failed to disclose anything and "because of mom's firm belief that this had taken place, I asked a couple of questions that could be considered leading." Specifically, Fenner asked the child "if anything had ever happened in the bathroom that made her uncomfortable." Fenner testified that the child used "grown up words" and said that "she pees and poops in the bathroom, and that poop is disgusting." Fenner also testified that she "asked her directly if anyone had ever touched her private parts * * * and then asked her if mom or dad had ever

done anything that made her uncomfortable."

{¶ 36} Fenner testified that she used drawings of body parts and that the child referred to the "butt, the vagina, and the penis" as "pee pee." The child also called breasts "boobies." Fenner testified that the child made no reference to "bobo."

{¶ 37} Fenner testified that she was concerned that the abuse was alleged to have occurred when the child was eighteen months old, but that ten months passed before any call alleging sexual abuse was made to the Agency. She was also concerned that therapy did not start for "fifteen months from the last alleged incident of sexual abuse." Fenner testified that "in child development, long term memory for an eighteen month old is very questionable. For a two year old, it gets shaky." She further testified that "it still means I don't know whether it happened or not. It gives me concern, just because developmentally, for a child to make those disclosures, a lot of the research indicates that it's not really possible. But, again, that doesn't say that it didn't happen. You know, it's just one of those things where it's so doggone gray. I don't know if any IQ testing has been done on [the child]. She presented to me as very normal developmentally for her age. You know, sometimes you look at that and you have a gifted three year old. But, a gifted three year old, it's still different than what happened to them when they were up to eighteen months old."

{¶ 38} Fenner indicated, when asked by the mother's attorney, that it was not uncommon for a child this age to be uncomfortable "sharing things with people they don't know." However, Fenner also testified that with "children who have previously made disclosures in the amount of detail that [this child] has been reported to make would find it much easier to make a disclosure in this situation, because it's already been out there." She

also testified that children that age "are very sexual beings, and so at that age, they begin to physically touch and explore their own body. It's not uncommon for them to do things that freak parents out, which is maybe when you're getting dressed, they reach out and touch you and ask about that. And it's all part of that age and becoming aware of body differences." When asked whether it would be abnormal for such a child to "try to put her mouth on – on her mother's private part," Fenner responded, "children do some weird things that don't mean anything. And so, I couldn't say yes or no to that." Fenner also indicated that "research says be very cautious when [using anatomically correct dolls] with young children, because they can be real inappropriate when they play with those dolls. And it's based on their age, not because of something that they remember happening, or knowing happened."

{¶ 39} Fenner testified that after the interview she reviewed a "23 page journal" that the mother had been keeping, that she interviewed Franck, and that she reviewed the calls made to her Agency. Fenner testified that her Agency then had a "care team conference" that included a juvenile prosecutor, county prosecutor, police in the appropriate jurisdiction, a doctor, a hospital social worker and two psychologists. She testified that her Agency was "unsubstantiating the allegation," and that the police informed her that they would not do any further investigation.

{¶ 40} The guardian ad litem, Jennifer Horner, also testified. Horner observed visitation between the father and the child at Erma's House on three occasions. She also met with the child at the mother's home. She interviewed Franck and asked to sit in on a therapy session, but this request was denied. She testified that Franck showed up unannounced when Horner went to meet the child at the mother's home. Horner also testified that the notes kept

by Erma's House indicate that the child reported that "mom told me to say this," and "mom said I can't play with dad." According to Horner, this led her to think "there may have been some coaching going on between mom and the child."

{¶ 41} According to Horner, each time she saw the father with the child, the child "was very comfortable, laughing, hugging, running around, dancing. They had a little routine that they would do every time they went to Erma's House. She was sad when they left." Horner also testified that she went to view the child at the mother's house following an Erma's House visitation because the mother indicated that the child always acted out following visitation. Horner testified that the child acted "normal, happy" and was having fun during that observation period.

{¶ 42} Horner indicated that she had filed three reports in this case. In her first report, she recommended keeping visitation at Erma's House until an investigation could be completed. In her final report, she recommended that the parties follow through with their agreement regarding visitation, and that the father be given unsupervised parenting time. She testified that she concluded that "nothing happened to [the child]." She further noted that the mother told Horner that she was depressed and wished she had not had the child. Horner testified that she advised the mother to seek therapy and that she did not doubt that the mother "believes beyond the shadow of a doubt that something happened to her child. And she needs to be able to grasp that and move through – move forward with it, or she's going to – it's going to be to her detriment and to the child's detriment"

{¶ 43} The father testified at the hearing. He admitted that he had left the child unattended on a king-sized bed and that the mother had expressed concern about the incident

to him. He also testified that he had put the child's hand by a fan to show the mother that her fingers could not go into the fan blades, and that the mother expressed concern about that. He denied having a BB gun where the child could touch it.

{¶ 44} The mother's attorney asked the father whether he had, in 2007, placed a banana between his legs and told the child to bite it. The father denied the incident. When asked whether he gave the child Gatorade against medical advice, he stated that he had let her drink Gatorade when he had some, but that he was not aware he should not do so. He testified that he remembered having windows open when he was remodeling his residence, but not that the child got close to the window. The father acknowledged the two pictures of him kissing the child's buttock and thigh, but stated that he thought many people took such pictures of their babies. When asked by the mother's attorney, he denied letting the child ever pick up a lighted candle, giving her a sexual massage book or showing her a Girls Gone Wild video. The father indicated that he had taken the child to the restroom with him two or three times because that was common in his family. He testified that after the mother discussed this with his pastor, his pastor indicated that doing so was not a good decision, and he stopped this practice.

{¶ 45} The magistrate made numerous findings of fact in this matter, including that: (1) there was no evidence presented that the child currently suffered from, or was on medication for, any medical condition; (2) the father had never been alone with the child, as all visitations had been supervised; (3) the mother reported the alleged abuse to several different agencies, all of whom found no evidence to substantiate her claims; (4) therapy with Franck did not result in any disclosure of substantiated abuse; (5) the mother "did not explain

why she states over and over again that the reason she wants supervised visitation only with someone she chose, either her mother or father, is for safety reasons when every incident she cited in her testimony of why the father should not have unsupervised parenting time occurred when she herself was supervising the visitation over a period of several years of the child's life"; (6) the father "testified that he did not think anything was wrong with taking the child to the bathroom when he had to go, but that when he talked to his pastor he found out that it was foolish and that people did not do that anymore and that he should not do that because it looked bad. He testified that he understood that it was not appropriate and did not do it anymore, that the child was a baby and he did not realize anything was wrong until the pastor told him he should not do it. * * * [the father] was extremely ill advised to take the child to the bathroom with him and pose for the pictures where the baby had her bare bottom to the camera"; (7) the GAL found that unsupervised parenting time with the father was in the child's best interest; and (8) despite her allegations, the mother testified that she wants the father to have a relationship with the child. The magistrate also considered the visitation factors set forth in R.C. 3109.051.

{¶ 46} The magistrate overruled the motion to terminate visitation and granted the father unsupervised visitation-parenting time in accordance with the Montgomery County Standard Order of Parenting Time. The mother filed objections, which were overruled by the trial court. In overruling the objections and adopting the decision of the magistrate, the trial court stated:

> [The mother] accuses [the father] of engaging in inappropriate sexual behavior
>
> with said child, as well as promoting unsafe living conditions in the presence of

said child. Specifically, [the mother] is concerned that [the father] took said child into the bathroom with him to urinate on several occasions. Further, [the mother] displayed pictures to the Court, depicting [the father] kissing said child on her naked body.

The Court notes that [the mother's] allegations of sexual abuse have been unsubstantiated despite investigations by the police, the agency, and the hospital. [The father] and said child interact appropriately during visits, and said child expresses love toward [the father]. Although this Court questions [the father's] judgment to allow said child to accompany him in a bathroom while urinating, the Court also notes that all of [the father's] visitations with said child have been supervised. Further, the magistrate's February 25, 2009 graduated visitation order would have allowed [the father] to exercise standard order of parenting time by now.

As [the mother's] contentions are unsubstantiated, [the father] has endured years of supervised visitations with said child, and [the father] does not appear to be a threat or danger to said child, the Court finds it in said child's best interest to grant standard order of parenting time to [the father] Thus, the Court hereby agrees with the decision of the magistrate.

{¶ 47} From the order of the trial court, the mother appeals.

II

**{¶ 48}** The mother's sole assignment of error states:

**{¶ 49}** "THE COURT'S FINDING THAT THE GRANT OF A STANDARD ORDER OF PARENTING TIME TO [THE FATHER] IS IN [THE CHILD'S] BEST INTERESTS IS AGAINST THE WEIGHT OF THE EVIDENCE."

**{¶ 50}** The mother's argument is based upon her contention that the child was sexually abused by the father, and that the trial court's conclusion that the child was not abused is against the manifest weight of the evidence. She contends that the magistrate showed bias toward Franck's testimony and ignored the fact that Franck "uncovered evidence of [the child's] sexual abuse at the hands of [the father]." She further contends that the "magistrate held a bias with respect to [the mother's] receipt of public assistance." The mother contends that it is "amazing that neither the Magistrate nor the trial court found substantiation for the allegations against [the father]" when, "among other things, [the child] was diagnosed with oral thrush resulting from the presence of candida bacteria in her mouth approximately a week after the trips to the bathroom with [the father] occurred, [and] later, the child suffered from a severe urinary tract infection." The mother also contends that she demonstrated numerous safety issues, including the father's failure to take a CPR course, which militate against permitting unsupervised visitation. Finally, the mother argues that "the bottom line is that there is a distinction between lack of substantiation and a finding that no abuse occurred. A lack of physical evidence, and a child's failure to disclose details of sexual abuse to strangers during a relatively brief interview, do not mean that the abuse did not occur."

**{¶ 51}** "[T]he weight to be given the evidence and the credibility of the witnesses are

primarily matters for the trier of facts to determine." *In re Guardianship of Smith,* 2d Dist. Clark No. 09CA0069, 2010–Ohio–4528, ¶ 19. The court of appeals has "an obligation to presume that the findings of the trier of fact are correct." *State v. Wilson,* 113 Ohio St.3d 382, 2007–Ohio–2202, 865 N.E.2d 1264, ¶ 24. A trial court's judgment will be reversed only if its factual findings are against the manifest weight of the evidence. *KeyBank Natl. Assn. v. Mazer Corp.,* 188 Ohio App.3d 278, 2010–Ohio–1508, 935 N.E.2d 428 (2d Dist.), ¶ 36. In the civil context, a judgment will not be reversed by a reviewing court as being against the manifest weight of the evidence if there is some competent, credible evidence going to all the essential elements of the case. *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978), syllabus.

{¶ 52} We find no support for the claim that the magistrate was biased against the mother because of her use of public assistance. It appears that the magistrate was merely expressing curiosity why Medicaid continued to pay for therapy when no diagnosis had been made regarding sexual abuse. Likewise, we do not find that the magistrate's use of quotation marks around the word therapy, in her decision, indicates a bias against Franck. Quotation marks were used in some places in the opinion, but not in others. The magistrate clearly considered Franck's testimony; it was for the magistrate to determine how much weight to give it.

{¶ 53} With regard to the claims that the episodes of thrush and a urinary tract infection prove that the child was sexually abused, we note that there is no evidence in the record to support this assertion. The mother did not specifically testify that either infection was caused by sexual abuse, nor was any other evidence, medical or otherwise, introduced to

establish that either infection was likely caused by sexual abuse, and not otherwise.

{¶ 54} With regard to the safety issues, the mother failed to present evidence that the child still suffered from the condition she was born with; specifically, the trouble with swallowing. Furthermore, there is no independent evidence to prove that the father needed to take a CPR course in order to deal with the condition when it manifested. With regard to the other "safety issues," we agree with the magistrate that at least one occurred when the mother, herself, was distracted from watching the child. Furthermore, there is no evidence that any of the other alleged incidents re-occurred after the mother warned the father about them.

{¶ 55} We have reviewed the record, including the transcript in excess of 400 pages. The evidence therein does not require a finding that the father abused his child.

{¶ 56} The mother claims that Franck "uncovered sexual abuse." But Franck never testified that the child had been abused. She testified that if the child "had a story to tell," "it would be told." Nothing in her records or her testimony makes any claim that sexual abuse, in fact, occurred. Franck testified that she was treating the child for behavioral issues.

{¶ 57} The record further demonstrates that the Agency and the police found no basis upon which to substantiate a charge of abuse. Likewise, there is no medical evidence in this case to corroborate a finding of abuse, despite the fact that the child was taken to the doctor and the hospital during times the mother suspected sexual abuse. The guardian ad litem was extensively involved in the case, and found nothing to support the mother's claims.

{¶ 58} The evidence in this case demonstrates that the father never exercised visitation without supervision. Many of the visits were done at Erma's House, where it was noted that the father and child interacted appropriately, and that the child was happy and comfortable

around the father. There is no evidence that the child was left unattended with the father during any of those visitations.

{¶ 59} The remainder of the visits were in the mother's presence. While she claimed that the father took the child into the restroom with him where she could not observe, her testimony does not support a finding that they were in the restroom longer than it took to utilize the facilities. Nowhere does the record support a finding that the child and the father were alone long enough for him to undress both himself and the child and "pee" on her before re-dressing both and cleaning up any evidence.

{¶ 60} Finally, although not remarked upon by the magistrate, we note that there is some evidence in the record from which it could be inferred that the mother was coaching the child. Franck's own testimony indicates that on several occasions the mother prompted the child to talk about the bathroom, and that the mother drew a picture with a phallus that she presented to the child when the child was not expressing herself. Also, there is evidence the child made statements in front of volunteer observers at Erma's House that the mother had told the child that she should be scared of her father and that she could not play with her father. The guardian ad litem alluded to this when she testified that "there may have been some coaching going on between mom and the child."

{¶ 61} The magistrate considered the relevant factors in deciding whether visitation is in the child's best interests. See R.C. 3109.051. We find no error in the magistrate's conclusions in that regard.

{¶ 62} We conclude that the evidence in this record supports a finding that the father did not abuse his child, and we conclude that the trial court's finding to this effect is not

against the manifest weight of the evidence. Therefore, the order of the trial court enforcing the agreement entered into between the parties, permitting the father to exercise unsupervised visitation, is neither an abuse of discretion nor against the manifest weight of the evidence.

{¶ 63} The mother's's sole assignment of error is overruled.

III

{¶ 64} The mother's sole assignment of error having been overruled, the order of the trial court of standard visitation, from which this appeal is taken, is Affirmed.

. . . . . . . . . . . . .

DONOVAN and FROELICH, JJ., concur.

Copies mailed to:

Cheryl R. Washington
D.P.
Hon. Nick Kuntz