DECISION AND JUDGMENT ENTRY
{¶ 1} This appeal from the Fulton County Court of Common Pleas arises out of claims brought by four stepchildren against the estate of their stepmother. Appellants, Randolph LaPoint, Roxanne Parris, Renee LaPoint, and Gina LaPoint, filed a complaint seeking damages for breach of contract, fraudulent misrepresentations and conversion against Woodrow Templeton, executor of the estate of Bonita Mae LaPoint. *Page 2 
Appellants are the natural children of Rudolph LaPoint, who predeceased appellants' stepmother, Bonita LaPoint. Bonita LaPoint had three natural children at the time she married Rudolph: Judith Eyer, Gerald Twining, and James Twining. One child, Shawn LaPoint, was born of Bonita and Rudolph's marriage.
 {¶ 2} Rudolph owned TwinpoinT, a corporation organized to operate several businesses. In 1989, Rudolph and Bonita executed reciprocal wills, with each will devising the testator's entire estate to the spouse. If one spouse predeceased the other, the three Twining children (Bonita's natural children) and Shawn LaPoint would inherit all business interests and the remaining assets would be split equally between all children and stepchildren.
 {¶ 3} According to the trial court's judgment, three days after Rudolph's death in 1998, the family met "for the purpose of reading Rudy's will." According to appellants' depositions, all of Rudolph's and Bonita's children met at Bonita's residence for the purpose of proceeding, together, to Rudolph's funeral service. When they were gathered, Bonita presented to them an attorney who then read Rudolph's will. Renee said, expressing the sentiments of all the appellants, "I thought I was coming to go to my dad's service and was kind of shocked that they were reading the will * * * I've never heard of somebody reading the will before the service."
 {¶ 4} Appellants allege that after the will reading, Bonita handed out written "waivers" to each individual child and stepchild, demanding that they waive their right to contest Rudolph's will. Each appellant recalls that Bonita promised, in exchange, that they would still share equally in Rudolph's and her assets. If a child refused, he or she *Page 3 
would receive nothing. According to Renee LaPoint, Bonita said that "the only way that we're going to get the tenth that her and my dad had promised us was to sign these papers and that she guaranteed us that if we did she would fulfill my dad's wishes and her promises and make sure that we each shared equally in their assets" and that if they did not sign the waivers immediately, she would make sure "that we never got nothing."
 {¶ 5} The children were uncomfortable signing and wanted to meet separately to discuss the matter. All appellants testified that Bonita became nervous and agitated when no one signed the waivers immediately. Randolph LaPoint remembered that Bonita said as they left the house to confer: "Well, you better not contest it, you remember that, you better not contest it because you'll lose everything!" Other appellants remembered a similar statement.
 {¶ 6} All of the children and stepchildren, except Randolph LaPoint, signed the waivers agreeing not to contest Rudolph's will. Bonita purportedly collected the individual waivers. These waivers were not submitted into evidence, and several appellants testified that they could not be found.
 {¶ 7} A few months after Rudolph's death, Bonita prepared a new will, which divided 99 percent of the business interests between her four natural children (Judy Eyer, Gerald Twining, James Twining, and Shawn LaPoint). The will further provided for the remainder of her assets to be converted to cash and distributed in equal shares between her natural children and stepchildren.
 {¶ 8} Within a year after Rudolph's death, and after executing the new will, Bonita transferred her entire interest in TwinpoinT to her four children. They each *Page 4 
received a 25 percent interest in TwinpoinT and they continue to operate the business. At his death, Rudolph's estate owned a 55 percent interest in TwinpoinT, valued at $385,000. In 1999, Bonita transferred the business real estate, valued at approximately $526,000, to her four children by general warranty deed.
 {¶ 9} Sometime in 2003, several disputed issues arose between Bonita and her natural children, including, inter alia, whether TwinpoinT would continue to provide health insurance to Bonita. With the disputes unsettled, Bonita executed a new will which gave her remaining interest in TwinpoinT, if any, to James Twining. The remainder of her assets was to be distributed equally between the Wauseon Rotary Club, the Village of Delta's Parks and Recreation Department, and the Sunshine Children's Home of Maumee, Ohio. The will explicitly made no provision for her three other children and her five stepchildren.
 {¶ 10} Bonita died in March 2006. Appellants did not contest her will, filing the instant action instead.
 {¶ 11} Templeton, executor for Bonita's estate, filed a motion for summary judgment, and the village of Delta and the Sunshine Children's Home filed amicus briefs in support. Appellants' motions in opposition included affidavits from Rae LaPoint and Christine Leffler, who witnessed the alleged oral promises by Bonita on the day of Rudolph's funeral. The trial court did not squarely find the existence of an oral contract, but found that the alleged oral promise by Bonita constituted a promise to make a will, barred by R.C. 2107.04.
 {¶ 12} Appellants assign one error and three issues for review: *Page 5 
 {¶ 13} "The trial court errored [sic] in granting defendants [sic] motion for summary judgment.
 {¶ 14} "A. O.R.C. 2107.04 is not dispositive since the agreement between the parties was not a contract to make a will.
 {¶ 15} "B. Plaintiffs' claim of fraud was not even addressed by the trial court.
 {¶ 16} "C. Decedent's conduct in excluding plaintiffs' [sic] violates fundamental principles of equity."
 {¶ 17} An appellate court reviewing a trial court's granting of summary judgment does so de novo, applying the same standard used by the trial court. Grafton v. Ohio Edison Co. (1996), 77 Ohio St.3d 102, 105. Civ.R. 56(C) provides:
 {¶ 18} "* * * Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. No evidence or stipulation may be considered except as considered in this rule. * * *"
 {¶ 19} The moving party bears the initial burden of informing the trial court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of fact as to an essential element of one or more of the nonmoving party's claims.Dresher v. Burt (1996), 75 Ohio St.3d 280, 292. Once this burden has been satisfied, the non-moving party has the burden, as set forth at Civ.R. 56(E), to offer specific facts showing a genuine issue for trial. Id. Only if the non-moving *Page 6 
party cannot raise an issue of fact should summary judgment be granted. Any doubt should be resolved in favor of the non-moving party.Zelina v. Hillyer, 165 Ohio App.3d 255, 2005-Ohio-5803, ¶ 12, citingViock v. Stone-Woodward Co. (1983), 13 Ohio App.3d 7, 12.
 {¶ 20} R.C. 2107.04, upon which the trial court relied, provides in its entirety: {¶ 21} "No agreement to make a will or to make a devise or bequest by will shall be enforceable unless it is in writing. Such agreement must be signed by the maker or by some other person at such maker's express direction. If signed by a person other than such maker, the instrument must be subscribed by two or more competent witnesses who heard such maker acknowledge that it was signed at his direction."
 {¶ 22} An oral contract to make a will is unenforceable. Snyder v.Warde (1949), 151 Ohio St. 426, paragraph one of the syllabus;Sherman v. Johnson (1953), 159 Ohio St. 209, paragraph four of the syllabus. Written contracts to make a will may be valid and may be enforced against heirs if a will is not executed accordingly.Kretzer v. Brubaker (1996), 74 Ohio St.3d 519, 521, citing Emery v.Darling (1893), 50 Ohio St. 160. Oral contracts promising payment after the promisor's death and out of the promisor's estate are, however, enforceable. "In an action against the executor or administrator of a decedent's estate to subject the estate to the payment of a claim, where the petition alleges that there is an oral contract between the plaintiff and the decedent, and where the contract as alleged indicates that it created a monetary obligation of the decedent existing in his lifetime, although such obligation was not, but the terms of the contract, to be discharged until after the death of the decedent, such petition does not *Page 7 
allege a contract to make a will, within the meaning of * * * Section2107.04, Revised Code, and states facts sufficient to show a cause of action." Moore v. Curtzweiler (1956), 165 Ohio St. 194.
 {¶ 23} The trial court did not squarely hold that an oral contract existed. Instead, it held that the alleged oral contract comprised Bonita's oral promise to make a will bequeathing shares of her estate in exchange for appellants' promise not to contest Rudolph's will. Appellants argue that the promise was much broader, meant to include asset transfers during Bonita's life or through after-death, non-testamentary instruments, such as transfer on death accounts, survivorship accounts, or trusts.
 {¶ 24} "[A]n express contract connotes an exchange of promises where the parties have communicated in some manner the terms to which they agree to be bound." Ford v. Tandy Transp., Inc. (1993),86 Ohio App.3d 364, 380, citing Cuyahoga Cty. Hospitals v. Price (1989),64 Ohio App.3d 410, 415. "A contract is generally defined as a promise, or a set of promises, actionable upon breach. Essential elements of a contract include an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and of consideration." Kostelnik v.Helper, 96 Ohio St.3d 1, 2002-Ohio-2985, ¶ 16, quoting PerlmuterPrinting Co. v. Strome, Inc. (N.D.Ohio 1976), 436 F.Supp. 409, 414.
 {¶ 25} However, where oral contracts are concerned, the "terms of an oral contract may be determined from `words, deeds, acts, and silence of the parties.'" Kostelnik, 2002-Ohio-2985, ¶ 15, quoting Rutledge v.Hoffman (1947), 81 Ohio App. 85, paragraph one of the syllabus. "[S]eldom, if ever, does the evidence in proof of an oral contract present *Page 8 
its terms in the exact words of offer and acceptance found in formal written contracts. And no such precision is required. It is sufficient if the intent is disclosed by word, deed, act, or even silence."Rutledge, 81 Ohio App. at 86. Therefore, while mutual assent is usually manifested by offer and acceptance, in oral contracts, mutual assent may be manifested by other acts or failures to act.
 {¶ 26} Appellants and appellee agree that appellants' consideration was to promise to refrain from contesting Rudolph's will. A promise not to contest a will, when the promisor has a good faith belief that valid grounds for contest exist, is sufficient consideration to form a contract. Rutledge, 81 Ohio App. 85, paragraph four of the syllabus. See, also, West v. Leslie (1941), 6 Ohio Supp. 251.
 {¶ 27} In his motion for summary judgment, appellee did not dispute that Bonita promised appellants "a share in her estate." Appellee disputes, however, the manner in which Bonita intended by her promise to accomplish the sharing, arguing that Bonita intended to effectuate her promise by making a new will accordingly. Appellants argue that Bonita never said the word "will" or mentioned distributing her assets by will. Instead, appellants argue that Bonita intended either to distribute their shares by inter vivos transfers or by non-testamentary vehicles after her death.
 {¶ 28} According to Christine Leffler, Bonita's sister, who was present at the meeting, Bonita "told all of the children that her children * * * would receive the Twinpoint businesses and that all of the rest of Rudy's and her assets would be distributed in equal shares to all of the Twining and LaPoint children, so long as none of them contested Rudy's will." Renee LaPoint averred the same in her affidavit. *Page 9 
 {¶ 29} Roxanne Parris testified to the agreement as follows: "* * * each of us had a piece of paper in front of us to sign saying we would not contest my father's will. And [Bonita] demanded we sign it and promised us that if we did, she would make sure that everything was done according to my father's wishes and promises and her wishes and promises, that it would be divided just as stated on this paper if we signed it * * * and she said if we did not sign it we did not know how much we had to lose." She added: "* * * it was never a matter of a will, it was a matter of a promise that was made, and when she was to fulfill her promise was never stipulated."
 {¶ 30} Gina LaPoint testified, "* * * it was just more open-ended, we were promised something that we've been promised our whole lives, she assured it, guaranteed that this would happen and we just trusted that she would fulfill her promise at some point in time." When asked whether Bonita had the right to give property away, she stated, "It was never discussed. I would say that it was assumed that it would be just like she said, that the kids would get the business and we'd get one-tenth of all of the assets of her and my father's combined assets." When Renee LaPoint was asked whether she knew that Bonita had rewritten her will, she stated, "I didn't know that Bonnie was reneging until I became aware of her will. * * * We had just, not that long before that, been discussing things and she led me to believe then that things were intact the way they were supposed to be."
 {¶ 31} Appellants also argue that Bonita's actions prior to death evidenced her intent to effectuate her promise through inter vivos transfers. They point to Bonita's transfers of TwinpoinT to her four children and the transfer of business real estate by *Page 10 
general warranty deed to her four children. These transfers, appellants argue, are evidence that Bonita did not intend to fulfill her promise by making a will; instead, they argue that it is consistent with a promise to fulfill her promise by distributing her estate through inter vivos transfers.
 {¶ 32} In contrast, however, appellee argues that Bonita's execution of a new will consistent with her promise shows that she intended to distribute appellants' share in her and Rudolph's estates by testamentary means. Appellants respond by noting, again, that the new will provided for the transfer of TwinpoinT after Bonita's death, yet she acted inconsistently by transferring all TwinpoinT shares before death.
 {¶ 33} The parties agree that an oral contract existed. It is unclear, however, whether Bonita's promise was a promise to distribute her and Rudolph's estate through a will, or whether Bonita promised to make transfers through non-testamentary means. If Bonita promised to make a will to distribute her assets, the promise is unenforceable pursuant to R.C. 2107.04. If, however, she promised to distribute her assets during her life in exchange for the consideration of appellants' promise not to contest Rudolph's will, an enforceable claim exists. Moore v.Curtzweiler (1956), 165 Ohio St. 194.
 {¶ 34} It is axiomatic that a "meeting of the minds" as to the essential terms is a prerequisite to enforcing an oral contract.Kostelnik v. Helper, 96 Ohio St.3d 1, 2002-Ohio-2985, ¶ 16. The parties must have communicated in some manner the terms to which they agreed.McSweeney v. Jackson (1996), 117 Ohio App.3d 623, 631, citingCuyahoga Cty. Hospitals v. Price (1989), 64 Ohio App.3d 410, 415. "The general rule is that contracts should be construed so as to give effect to the intention of the parties." *Page 11 Aultman Hosp. Ass'n v. Community Mutual Ins. Co. (1989),46 Ohio St.3d 51, 53, citing Employer's Liability Assurance Corp. v. Roehm (1919),99 Ohio St. 343, paragraph one of the syllabus. We question whether a meeting of the minds occurred, because, apparently, Bonita's intent regarding the manner in which she would fulfill her promise was unclear even to appellants. After the promise, she acted in a manner consistent with both interpretations: she made a new will and she began inter vivos transfers of her assets according to the will's provisions.
 {¶ 35} If the language expressing the parties' intent is clear and unambiguous, then interpretation of the terms is a matter of law and not for the trier of fact. Where, however, contractual terms are ambiguous, the meaning of the terms and the intent of the parties raises questions of fact. "While it is the function of a court to construe a contract, it is the province of the jury to ascertain and determine the intent and meaning of the contracting parties in the use of uncertain or ambiguous language." Amstutz v. Prudential Ins. Co. of America (1940),136 Ohio St. 404, 408. This rule applies to oral contracts. "The fact of the existence of a contract and the terms of an oral contract are ordinarily for the determination of the jury in light of the evidence offered, to be determined from all the facts, words, acts, conduct, and circumstances surrounding the parties at the time." 89 Ohio Jurisprudence 3d, Trial, Section 178. See, also, Lucas v.Costantini (1983), 13 Ohio App.3d 367.
 {¶ 36} Where circumstances exist from which reasonable minds may draw two different conclusions, the evidence is submitted to a jury.Keesecker v. G.M. McKelvey Co. (1943), 141 Ohio St. 162, 167-168. Even when all the facts are not in dispute, if *Page 12 
conflicting inferences can be reasonably drawn from the facts, then the ultimate issue is for the jury. Darling v. Younker (1882),37 Ohio St. 487; Hickman v. Ohio State Life Ins. Co. (1915), 92 Ohio St. 87, 95. Again, this is particularly true with respect to the intent of a deceased person in a claim against an estate, Cork v. Bray (1990),52 Ohio St.3d 35, and with oral contracts. Brannan v. Fowler (1995),100 Ohio App.3d 577, 583 (unclear whether deceased promised that plaintiff would receive business when he died or when "something happened to him" was contract to make a will). Courts have submitted similarly unclear oral contracts to a jury. Perkins v. Duncan (1963), 194 N.E.2d 907, 92 Ohio Law Abs. 350; Petroleum, Inc. v. Liberty Petroleum Corp. (C.A.6, 1974), 505 F.2d 1384; Arnold Palmer Golf Co. v. Fuqua Industries,Inc. (1976), 541 F.2d 584; Normandy Place Associates v. Beyer (1982), 2 Ohio St.3d 102; A.W. Kowit Investment Co., Inc. v. Atwell (Oct. 28, 1993), 8th Dist. No. 62778; Hines ex rel. Estate of Kelsch v.Kelsch (Aug. 17, 2001), 1st Dist. Nos. C-000445, A-9903656.
 {¶ 37} Here, however, while Bonita made some sort of promise, there appears to be no meeting of the minds as to the essential terms of the agreement and we question whether a contract was formed. That is, although appellants may have granted Bonita the consideration she requested by refraining from contesting Rudolph's will, appellants were never aware of definite terms in the offer or promise which they were accepting. They are simply uncertain as to how Bonita intended to accomplish the distribution. Their testimony demonstrates that they did not expect her to distribute their shares of her and Rudolph's estate until after she died. See Gottfried-Smith v. Gottfried (1997),119 Ohio App.3d 646. *Page 13 
 {¶ 38} Assuming, arguendo, that an oral contract existed, the only reasonable interpretation is that appellants understood that they would not receive their share until after Bonita died. Bonita's alleged statements — and appellants' subsequent expectations-could not be interpreted otherwise. Moreover, determining a person's intent — after death — at the time the deceased entered into an oral contract is precisely what the statute of frauds was intended to preclude. The deceased is not available to testify or to refute the claimant's version of the deceased's intent. "[T]he only person who could speak the truth with reference to such claims has his lips sealed in death." Snyder v.Warde, 151 Ohio St. at 445. Appellants' first issue is not well-taken.
 {¶ 39} The second issue must also be not well-taken. True, the trial court did not address appellants' claim of fraudulent misrepresentations. Summary judgment was entered, however, as to all claims. Appellants had alleged that when Bonita made her oral promises, she knew they were false, and appellants relied on the false representations to their detriment.
 {¶ 40} A breach of contract, even if proven, does not necessarily demonstrate that the promisor in breach made an intentional false promise at the time of contracting. Moreover, as discussed supra, we find that Bonita intended by her promise to make a will. That promise is unenforceable. Appellants cannot accomplish through a claim of fraudulent misrepresentation what they were unable to accomplish with an unenforceable contract.
 {¶ 41} Third, appellants argue that fundamental principles of equity require the judicial grant of some compensation for Bonita's "betrayal" of their "confidential *Page 14 
relationship." In support, they advance the bases of quantum meruit and constructive trusts. With respect to quantum meruit, courts have held that a plaintiff presents a valid claim against an estate when the plaintiff has provided services to the decedent during life and the decedent promised compensation after his death. See Sabin v. Graves
(1993), 86 Ohio App.3d 628, citing, inter alia, Bemis v. Bemis (1948),83 Ohio App. 95. Here, however, the rule cannot apply since appellants have never alleged they provided compensable services to Bonita. "Quantum meruit," meaning "as much as he has deserved," is "a claim or right of action for the reasonable value of services rendered." Black's Law Dictionary, 7th Ed., p. 1255.
 {¶ 42} Likewise, the principles of constructive trusts are inapplicable. "A constructive trust is an equitable remedy that protects against unjust enrichment and is usually invoked when property has been obtained by fraud. [A] constructive trust may also be imposed where it is against the principles of equity that the property be retained by a certain person even though the property was acquired without fraud. In applying the theories of constructive trusts, courts also apply the well known equitable maxim, equity regards [as] done that which ought to be done." Estate of Cowling v. Estate of Cowling, 109 Ohio St.3d 276,2006-Ohio-2418, ¶ 19 (internal citations and quotations omitted). Since appellants have not demonstrated fraud or unjust enrichment, a constructive trust cannot be created. Although appellants argue persuasively that Bonita did not deal fairly with her stepchildren, the alleged oral contract to make a will is unenforceable. Absent a binding contract to do so, and absent any showing of fraud and abuse, Bonita's *Page 15 
testamentary choice of beneficiaries is "that which ought to be done," and cannot be attacked in this manner. Appellants' third issue is not well-taken.
 {¶ 43} For the foregoing reasons, appellants' assignment of error is not well-taken. The judgment of the Fulton County Court of Common Pleas is affirmed. Appellants are ordered to pay the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Fulton County.
JUDGMENT AFFIRMED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4.
 Peter M. Handwork, J., Arlene Singer, J., William J. Skow, J. CONCUR. *Page 1