[Cite as *Schlaegel v. Howell*, 2015-Ohio-4296.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**CHAMPAIGN COUNTY**

JERRY SCHLAEGEL, et al.          :
                                 :
    Plaintiffs-Appellants        :          Appellate Case No. 2014-CA-37
                                 :
v.                               :          Trial Court Case No. 13-CV-36
                                 :
TERRY HOWELL, et al.             :          (Civil Appeal from
                                 :           Common Pleas Court)
    Defendants-Appellees         :
                                 :

. . . . . . . . . . .

O P I N I O N

Rendered on the 16th day of October, 2015.

. . . . . . . . . . .

JAMES M. HILL, Atty. Reg. No. 0030633, James M. Hill Co., L.P.A., 2365 Lakeview Drive, Suite A, Beavercreek, Ohio 45431-3639
    Attorney for Plaintiffs-Appellants

RICK BRUNNER, Atty. Reg. No. 0012998, and PETER CONTRERAS, Atty. Reg. No. 0087530, 35 North Fourth Street, Suite 200, Columbus, Ohio 43215
    Attorneys for Defendants-Appellees

. . . . . . . . . . . . .

HALL, J.

    **{¶ 1}** The plaintiffs, Jerry Schlaegel; J&J Champaign, LLC; and J&J Schlaegel, Inc., appeal the entry of summary judgment for the defendants, Terry Howell and Howell

Land Development, LLC, on the plaintiffs' claims for breach of joint venture, breach of fiduciary duty, quantum meruit, unjust enrichment, conversion, and tortious interference. Finding no error, we affirm.

## I. Background

{¶ 2} Jerry Schlaegel owns J&J Schlaegel—a construction company that does site development, underground utilities, bridges, roads, and the like—and also owns J&J Champaign, a holding company. Terry Howell owns Howell Land Development, LLC, a general contracting company that does business under the name Howell Buildings Company.

{¶ 3} Schlaegel alleges that in December 2011 he and Howell entered into a joint venture to build and lease a research facility for Pioneer Hi-Bred International. Specifically, Schlaegel claims, they agreed that

- they would prepare and submit a proposal for the Pioneer project;

- J&J Schlaegel would provide the bid for the site-preparation work;

- Howell Land Development would provide the bid to construct the facility;

- J&J Schlaegel would do the site-preparation work and Howell Land Development would construct the facility, if the proposal was accepted;

- they would jointly obtain financing for the project;

- at the end of the joint venture, J&J Champaign and Howell Land Development would form a limited-liability company that would own and lease the facility.

{¶ 4} In January 2012, Howell Buildings Company submitted a proposal to Pioneer to build and lease the facility. The proposal's cover letter states in part that "Howell Buildings Company will build the project, and will partner with J&J Schlaegel to form an

ownership LLC for a partnership with Pioneer in this venture." The letter also says:

> Your site, as I explained does not have municipal or county water or sewer readily available. However we have consulted a local Professional Civil Engineer, who has worked locally in the Champaign County area for over thirty years, and he has extensive experience with EPA and local health department regulations. Both we and he are extremely confident of obtaining local permits for on-site septic and/or mound treatment.
>
> Our partners in this venture, J&J Schlaegel, have extensive experience in on-site treatment installation. They are also ODOT contractors in site, roadway, and bridge construction in addition to installation and maintenance of such sewage treatment installations.

{¶ 5} The proposal gives the total cost to build the facility as $1,766,432 plus the cost of the land on which the facility would be built ($85,000). The cost breakdown shows the site-work cost as $339,650, which includes installing a storm water detention area, paving the parking area, and an $85,000 allowance for utilities to service the site. J&J Schlaegel had given Howell a bid for the site work, but according to Howell, the site-work cost included in the proposal to Pioneer is not based on J&J's bid but on a bid from another company. Howell says that he did not use J&J's bid because it was too high. J&J's bid was $329,999, but that did not include the $85,000 site-utility allowance or the cost of paving the parking area, which Howell estimated would be $35,000. Consequently, J&J's bid would have increased the site-work cost (and the entire proposal) by $110,349 ($329,999 + $85,000 + $35,000 − $339,650).

{¶ 6} Pioneer accepted Howell's proposal. In February, Howell filed articles of

organization for A&C Land Development LLC (named for Howell's and Schlaegel's sons, Andy Howell and Chris Schlaegel). (The articles bear only Howell's name and signature.) A&C and Pioneer then executed a lease agreement for the facility. (Only Howell signed for A&C.) One provision of the lease (Article XVI) pertinently provides that "Lessor [A&C] hereby represents and warrants that it is the owner of the Property and that it has the right and authority to enter into this Agreement without the joinder or approval of any other person." Pioneer owned an option to purchase the land on which the facility was to be built, and in early March, it assigned A&C its interest in the option. The option expired on March 31, however, so A&C had to purchase and close on the property by then or seek an extension of time. Howell and Schlaegel received an email in mid-March telling them that their joint application for lease financing had been approved. But the approval notice states that the lease will not close if certain conditions are not satisfied. The conditions include a "[s]igned copy of lease/rent agreement with Pioneer Hy-Bred [sic] International, Inc." and "[s]atisfactory entity documents."

{¶ 7} On March 14, Howell emailed Schlaegel asking for input on what their respective roles would be in A&C. Schlaegel responded with his thoughts for an operating agreement, which he said should include a provision that J&J Schlaegel would perform all site work except paving, as identified in J&J's bid. Howell responded with a draft operating agreement, dated March 15, 2012. Among the provisions in Howell's draft agreement is one stating that Howell Land Development will serve as general contractor for the Pioneer project "and have the full discretion to hire whoever it makes the most economical sense to provide those construction services." Another provision states in part that "J&J Champaign LLC shall have the site work responsibility for the execution and risk

associated with such projects and pledges to provide the most economical pricing to be competitive with all functions associated." On March 19, Schlaegel sent Howell an email in which he proposed several revisions to the draft agreement. One change Schlaegel wanted was the phrase "most economical" removed from the just-quoted provision. Schlaegel also notes in the email that they "still need an agreement between J&J Champaign or J&J Schlaegel for site work and Howell Buildings as general contractor." On the same day, Schlaegel sent Howell another email that sets forth numerous "action items" that he thought needed to be done for A&C. Among these were completing the operating and buy-sell agreements and writing up the Pioneer agreement between Howell Land Development and J&J Schlaegel.

{¶ 8} Howell never responded to Schlaegel's proposed revisions or "action items." Instead, sometime before the end of March, Howell told Schlaegel that he (Schlaegel) would no longer be part of the Pioneer project. According to Howell, the problem was his and Schlaegel's inability to agree on who would do the site work. The expiration of A&C's unexercised land-purchase option, on March 31, says Howell, violated Article XVI of A&C's lease agreement with Pioneer, so Pioneer terminated the agreement. With no signed leased agreement and no operating agreement, the lease financing would not close. Moreover, without the land on which the facility was to be built, the project could not move forward. For these reasons, Howell decided to continue with the Pioneer project without Schlaegel doing the site work. Howell hired the other company, whose site work costs had been included in the Pioneer proposal, and he formed Howell Bros. Development, LLC, to own and lease the facility.

{¶ 9} In February 2013, Schlaegel (and his companies) filed suit against Howell

(and his company). The amended complaint asserts six claims for relief. The first claim alleges the breach of joint venture and/or partnership agreements. The second claim alleges that the defendants breached their fiduciary duty to the plaintiffs by negotiating with Pioneer and others to exclude the plaintiffs from the Pioneer project. The third claim for relief alleges that the defendants breached their contract with the plaintiffs by not hiring J&J Schlaegel to perform the site work for the Pioneer facility. The fourth claim is for quantum meruit and unjust enrichment, alleging that the plaintiffs expended considerable time, money, and goodwill in support of the Pioneer project and that the defendants have been unjustly enriched as a result of the plaintiffs' expenditures. The fifth and sixth claims are for conversion and tortious interference. These two claims allege that the defendants wrongly interfered with or exercised control over the plaintiffs' business relationships with A&C, Pioneer, and the defendants.

{¶ 10} The defendants moved for summary judgment on all of the claims. They contended that the parties never entered into an enforceable joint-venture contract. Howell contended that he never agreed to hire J&J Schlaegel to perform the site work on the Pioneer project. The trial court sustained the motion. The court concluded, based on the evidentiary material presented, that there was no "meeting of the minds" on the two essential terms of the alleged joint-venture contract—who would do the site work and the ownership of the facility. The parties, said the court, agreed only to a framework for further negotiation, which is an unenforceable "agreement to make an agreement."

{¶ 11} The plaintiffs appealed.

## II. Analysis

{¶ 12} The plaintiffs assign seven errors to the trial court's entry of summary

judgment. The first six challenge summary judgment on the claim for breach of the alleged joint-venture agreement. The seventh assignment of error challenges summary judgment on the claims for breach of fiduciary duty, quantum meruit, unjust enrichment, conversion, and tortious interference.[1]

{¶ 13} "Summary judgment will be granted only when there remains no genuine issue of material fact and, when construing the evidence most strongly in favor of the nonmoving party, reasonable minds can only conclude that the moving party is entitled to judgment as a matter of law." *Byrd v. Smith*, 110 Ohio St.3d 24, 2006-Ohio-3455, 850 N.E.2d 47, ¶ 10, citing Civ.R. 56(C). The initial burden of showing that no genuine issue of material fact exists is on the moving party. *Dresher v. Burt*, 75 Ohio St.3d 280, 294, 662 N.E.2d 264 (1996). If the movant satisfies this burden, the nonmoving party "may not rest upon mere allegations or denials of the party's pleadings, but the party's response, by affidavit or as otherwise provided in this rule [Civ.R. 56], must set forth specific facts showing that there is a genuine issue for trial." Civ.R. 56(E).

## A. The existence of a joint venture

{¶ 14} "A joint venture is '* * * an association of persons with intent, by way of contract, express or implied, to engage in and carry out a single business adventure for joint profit, for which purpose they combine their efforts, property, money, skill and knowledge, without creating a partnership, and agree that there shall be a community of interest among them as to the purpose of the undertaking, and that each coadventurer shall stand in the relation of principal, as well as agent, as to each of the other

---

[1] The appellants do not challenge the entry of summary judgment on the breach-of-contract claim.

coadventurers * * *.' " *Al Johnson Const. Co. v. Kosydar*, 42 Ohio St.2d 29, 325 N.E.2d 549 (1975), paragraph one of the syllabus, quoting *Ford v. McCue*, 163 Ohio St. 498, 127 N.E.2d 209 (1955), paragraph one of the syllabus. "[T]he elements of a joint venture are: (1) a contract, express or implied; (2) the intent to associate as joint venturers; (3) contributions from each co-venturer to the common enterprise; (4) equal control or authority of the co-venturers over the enterprise, (5) an agreement to share profits and a sharing of losses, (6) a single enterprise as opposed to a continuing business." (Citation omitted) *Carey v. Seeley's Ceramic Serv., Inc.*, 2d Dist. Miami No. 93-CA-30, 1994 WL 124849, *2 (Apr. 13, 1994).

{¶ 15} Fundamentally, "[a] joint venture is a contractual association in which the parties intend to carry out a common business purpose." (Citation omitted.) *Nilavar v. Osborn*, 127 Ohio App.3d 1, 20, 711 N.E.2d 726 (2d Dist.1998). " '[J]oint venture agreements may be oral, [but] they are, nonetheless, still contracts, and thus subject to all of the applicable requirements of contract law." *Olympic Holding Co. LLC v. ACE Ltd.*, 122 Ohio St.3d 89, 2009-Ohio-2057, 909 N.E.2d 93, ¶ 46, quoting *Garg v. Venkataraman*, 54 Ohio App.3d 171, 172, 561 N.E.2d 1005 (9th Dist.1988). "A contract of joint adventure need not be established by showing an express agreement between the parties, but it may be implied or inferred, in whole or in part, from their acts and conduct." *Bennett v. Sinclair Refining Co.*, 144 Ohio St. 139, 57 N.E.2d 776 (1944), paragraph five of the syllabus.

{¶ 16} Here, the trial court concluded that the plaintiffs failed to produce sufficient evidence to show that a joint venture exists. Specifically, the court concluded that there is no enforceable joint-venture contract, because there was no "meeting of the minds" on

two essential terms—site-work and ownership. The evidentiary materials, said the court, show that Howell understood the site-work agreement to be that J&J Schlaegel would do the work if its bid was competitive with other bidders, not like the plaintiffs assert, that J&J would do the work regardless of how much it charged. Also, pointing to the failure to execute an operating agreement for A&C Land Development, the trial court said that the evidentiary materials show that the parties failed to reach an agreement as to the ownership of the Pioneer facility. At best, said the court, the evidence shows that the parties made only an unenforceable "agreement to make an agreement." We think that the trial court got it right.

{¶ 17} A requirement to enforcing a contract is " '[a] meeting of the minds as to the essential terms of the contract.' " *Minster Farmers Coop. Exchange Co. v. Meyer*, 117 Ohio St.3d 459, 2008-Ohio-1259, 884 N.E.2d 1056, ¶ 28, quoting *Kostelnik v. Helper*, 96 Ohio St.3d 1, 2002-Ohio-2985, 770 N.E.2d 58, ¶ 16. And as to the essential terms, the contract must be specific. *Scotts Co. v. Cent. Garden & Pet Co.*, 403 F.3d 781, 788 (6th Cir.2005) (saying that "an agreement lacking terms specific enough to be enforced falls short of the Ohio standard for a valid contract"). In Ohio case law, the "meeting of the minds" concept is used interchangeably with the concept of "mutual assent." *Advance Sign Group, LLC v. Optec Displays, Inc.*, 722 F.3d 778, 784 (6th Cir.2013). Under either concept, the standard is objective. *216 Jamaica Ave., LLC v. S & R Playhouse Realty Co.*, 540 F.3d 433, 440 (6th Cir.2008), citing *Nilavar*, 127 Ohio App.3d 1, 711 N.E.2d 726. Put in mutual-assent language, for a contract to be enforceable, there must be a manifestation of mutual assent—generally, offer and acceptance—to the contract's essential terms. *Nilavar* at 11. " '[W]hile mutual assent is usually manifested by offer and

acceptance, in oral contracts, mutual assent may be manifested by other acts or failures to act.' " *KeyBank Natl. Assn. v. Mazer Corp.*, 188 Ohio App.3d 278, 2010-Ohio-1508, 935 N.E.2d 428, ¶ 33 (2d Dist.), quoting *LaPoint v. Templeton*, 6th Dist. Fulton No. F-07-014, 2008-Ohio-1792, ¶ 25. " ' "It is sufficient if the intent is disclosed by word, deed, act, or even silence." ' " *Id.*, quoting *LaPoint* at ¶ 25, quoting *Rutledge v. Hoffman*, 81 Ohio App. 85, 86, 75 N.E.2d 608 (1st Dist.1947).

{¶ 18} Here, the evidentiary materials submitted by the defendants do not raise a genuine issue of material fact that Howell agreed to use J&J Schlaegel's site-work bid regardless of the amount. The materials show that Howell was quite concerned about the cost of the Pioneer project.

{¶ 19} Howell states in his affidavits that he did not use J&J's site-work bid because it was too high. *Affidavit of Terry Howell*, ¶ 5 (Mar. 25, 2013)*; Affidavit of Terry Howell*, ¶ 10 (Aug. 18, 2014). And he told Schlaegel this in two different emails. In a February 15, 2012 email, Howell told Schlaegel: "Right now we (Chief, J&J, Geuy, etcc) are too high, and I did not use those numbers in the bid I gave Pioneer." Howell told Schlaegel that he wanted to use J&J but doing so would cost too much: "I want to use J&J for the excavation but cannot if that makes our total costs in excess of the $1,766,432 quoted. I added a small profit, not very much, but it certainly cannot absorb those differences in cost." In a March 19, 2012 email, Howell told Schlaegel: "As I have stated repeatedly, I could not use our (your site number was at first glance $190K higher and Chief's was $14K higher) numbers including your site work number when I developed the $1,851,432 proposal." Howell states in an affidavit that the proposal's site-work cost is based on a bid from another company "plus additional estimated costs for storm draining.*"*

*Affidavit of Terry Howell*, ¶ 23 (Aug. 18, 2014). He told Schlaegel this in the February 15, 2012 email: "When I submitted the bid their numbers plus what I added for the storm drainage to their numbers was used." Using J&J Schlaegel for the site work, says Howell, would have cost significantly more money: "The total bid and the site-work line item estimation in the proposal would have been substantially higher if J&J Schlaegel's bid had been used because it does not include certain significant items or expenses that were included." *Id.* at ¶ 14. In particular, J&J's bid includes neither the required site-utility allowance nor the cost of paving, so it would have cost around $110,000 more for J&J to do the site work. *Id.* at ¶ 20.

{¶ 20} Howell's draft operating agreement for A&C also shows that Howell was cost conscious and not willing to hire J&J Schlaegel at any price. In response to Howell's query about managing A&C, Schlaegel sent Howell an email on March 14, 2012, containing a number of suggestions. In particular, Schlaegel wanted a provision saying that "J&J Schlaegel, Inc. will partner with the GC [Howell Buildings] to perform all site work except paving as [i]dentified to GC at time of bid in amount of 329,999.48 as a lump sum." Howell incorporated many of Schlaegel's suggestions in the draft operating agreement. But as to site work on the Pioneer project, Howell's provision in the draft agreement states that Schlaegel "pledges to provide *the most economical pricing to be competitive* with all functions associated." (Emphasis added.). Schlaegel's response to the draft agreement tells Howell to remove the phrase "most economical."

{¶ 21} Construing the evidence in the plaintiffs' favor, the evidentiary materials presented by the defendants do not demonstrate a genuine issue of material fact that Howell agreed to hire J&J Schlaegel to do the site work regardless of what Schlaegel

charged. There was no "meeting of the minds" on this essential term of the purported joint-venture contract.

{¶ 22} None of Schlaegel's arguments in the first six assignments of error convince us otherwise. The first assignment of error argues that Schlaegel's 2014 affidavit by itself is sufficient to show a genuine issue of material fact as to the existence of a joint venture. Schlaegel's 248-page deposition, taken on April 4, 2014, was among the material submitted in support of the defendants' motion for summary judgment. The deposition covers, in painstaking detail, the plaintiffs' claim that there was a joint-venture agreement, including Schlaegel's assertion that he and Howell agreed that Schlaegel's company would perform the site work. Viewed as a whole, Schlaegel's largely narrative 7-page affidavit, dated July 28, 2014, attempts to rewrite critical aspects of the deposition. For instance, in the affidavit, Schlaegel states that in December 2011 he and Howell explicitly agreed that J&J Schlaegel would do the site work: "We agreed that J&J Schlaegel, would provide a bid for all the site preparation and utilities that the project required, and his company, Howell Land Development would provide a bid to complete the rest of the project which included the building itself. We agreed those two numbers combined, as Howell and I had always done in the past, would serve as the total price of the bid." *Affidavit of Jerry Schlaegel*, ¶ 12 (July 28, 2014). But in the deposition, Schlaegel testified that their agreement was implicit:

Q. He specifically agreed that he personally was hiring J&J Schlaegel? Not opposed to his role with Howell Land Development, but he personally?

A. He never had to say it. We were a partnership. It had already been established what our rules were. So Terry didn't have a say whether Jerry–

J&J Schlaegel did the excavating. It was already determined that J&J Schlaegel would do the excavating.

Q. Okay. When was this determined?

A. Back in 2009.

Q. Okay. In 2009, how was that contract created?

A. Terry and I worked together. We came up with a plan and agreed on how it was going to be followed and we followed it to a tee.

(Schlaegel dep. 34-35). This exchange shows that Schlaegel believed that their "agreement" was somehow formed in 2009 through either a partnership or a course-of-dealing rather than by a specific agreement at the time of the 2012 Pioneer proposal, as his affidavit states.

{¶ 23} We have previously recognized that an "affidavit of a party opposing summary judgment that contradicts former deposition testimony of that party may not, without sufficient explanation, create a genuine issue of material fact to defeat the motion for summary judgment." *Gessner v. Schroeder*, 2d Dist. Montgomery No. 21498, 2007-Ohio-570, ¶ 53, citing *Byrd*, 110 Ohio St.3d 24, 2006-Ohio-3455, 850 N.E.2d 47, paragraph three of the syllabus. Schlaegel's 2014 affidavit does not explain its contradictions with the deposition. Furthermore, "a non-movant's own self-serving assertions, whether made in an affidavit, deposition or interrogatory responses, cannot defeat a well-supported summary judgment when not corroborated by any outside evidence." *White v. Sears, Roebuck & Co.*, 10th Dist. Franklin No. 10AP-294, 2011-Ohio-204, ¶ 9. In that case, the plaintiff had worked for the defendant for 17 years when his employment was terminated. The plaintiff claimed that the defendant had an unwritten

policy of giving a terminated employee two weeks of severance pay for every year of employment. The defendant denied any such policy. The only evidence in opposition was the plaintiff's own assertions in discovery and by affidavit that such a policy existed. That, held the court of appeals, was insufficient to avoid summary judgment. Applying either of the foregoing concepts to Schlaegel's affidavit assertion that there was an agreement that his company would do the site work, we conclude that the materials submitted fail to create a genuine issue of material fact as to the use of J&J Schlaegel for the site work.

{¶ 24} The second assignment of error argues that the parties' conduct shows that there is a genuine issue as to the existence of a joint venture. The argument here cites plenty of evidentiary material that shows an intent to associate as joint venturers but cites nothing that shows a meeting of the minds on who would do the site work. The third assignment of error argues that the lack of a final written operating agreement for A&C is not dispositive to the existence of a joint venture. We agree. But this, along with other material, does not create a genuine issue of fact as to whether the parties' December 2011 "agreement" was specific enough as to its essential terms to be enforceable. The fourth assignment of error argues that there is a genuine issue as to whether Howell *agreed* to use J&J Schlaegel's bid in the Pioneer proposal, and the fifth assignment of error argues that there is a genuine issue as to whether Howell *used* J&J Schlaegel's bid in the proposal. We have already dealt with the lack of a genuine issue as to the use of J&J Schlaegel's bid at any cost. In addition, the arguments in these assignments of error do not point to any evidentiary material, other than Schlaegel's own assertions in his affidavits and deposition, that raise a genuine issue as to either fact. Only the sixth assignment of error directly addresses the "meeting of the minds" contract element and

the trial court's conclusion that there was none. That assignment argues that there are genuine issues as to whether there was a "meeting of the minds" and contends that there are genuine issues as to whether Schlaegel and Howell's agreement was merely an agreement to make an agreement. But the argument adds nothing new and merely cites the arguments in previous assignments of error, all of which we have rejected.

{¶ 25} "Where an agreement contemplates further action toward formalization or if an obligation to become binding rests on a future agreement to be reached by the parties, so that either party may refuse to agree, there is no contract." (Citations omitted.) *Weston, Inc. v. Brush Wellman, Inc.*, 8th Dist. Cuyahoga No. 65793, 1994 WL 393685, *5 (July 28, 1994), citing *Smith v. Kissell Co.*, 2d Dist. Montgomery No. 10012, 1987 WL 10163, *2 (Apr. 10, 1987) (saying that "where an agreement contemplates further action toward formalization, there is no binding contract"). Here, the evidentiary material shows that Schlaegel and Howell's December 2011 agreement contemplated further action. And for three months, they tried to reach final agreement on the terms of their joint venture. Because they were unsuccessful, no joint-venture contract ever arose. Schlaegel and Howell's agreement to work towards an agreement on the Pioneer project is not per se unenforceable. *Champion Gym & Fitness, Inc. v. Crotty*, 178 Ohio App.3d 739, 2008-Ohio-5642, 900 N.E.2d 231, ¶ 13 (2d Dist.). But to be enforced, Schlaegel and Howell must have "manifested an intention to be bound" by the terms of their agreement to agree and their intentions must be "sufficiently definite to be specifically enforced," *M.J. DiCorpo, Inc. v. Sweeney*, 69 Ohio St.3d 497, 503, 634 N.E.2d 203 (1994), quoting *Normandy Place Assoc. v. Beyer*, 2 Ohio St.3d 102, 105, 443 N.E.2d 161 (1982). If they "merely negotiated toward a formal contract without ever reaching it," the agreement to

agree is not binding. *Borkey v. J.F. Glaze Cleveland L.L.C.*, 2014-Ohio-3727, 18 N.E.3d 820, ¶ 7 (8th Dist.), citing *Oglebay Norton Co. v. Armco*, 52 Ohio St.3d 232, 236, 556 N.E.2d 515 (1990). We agree with the trial court's observation that the parties "were talking past each other on this project." *Journal Entry Granting Defendants' Motion for Summary Judgment*, 15 (Nov. 18, 2014). The evidentiary material presented here does not show a sufficiently definite intention to be bound. Instead, the material shows that Schlaegel and Howell negotiated toward a final agreement, getting stuck on who would do the site work and on the nature of terms that would govern their relationship. Ultimately, they never reached final agreement on either issue.

{¶ 26} The defendants satisfied their initial burden to show that no genuine issue of material fact exists. But the plaintiffs failed to satisfy their reciprocal burden to present evidence that sets forth specific facts showing that a genuine issue exists for trial. Construing the evidence most strongly in favor of the plaintiffs, reasonable minds can only conclude that there was no joint-venture contract binding the parties. Therefore summary judgment for the defendants is proper on the breach-of-joint-venture claim.

{¶ 27} The first, second, third, fourth, fifth, and sixth assignments of error are overruled.

## B. The claims for breach of fiduciary duty, quantum meruit, unjust enrichment, conversion, and tortious interference

{¶ 28} The seventh assignment of error alleges that the trial court erred by entering summary judgment for the defendants on the claims for breach of fiduciary duty, quantum meruit, unjust enrichment, conversion, and tortious interference. Summary judgment is proper on these claims too.

{¶ 29} "[P]arties to a joint venture, like those in a partnership, owe each other the duties of fiduciaries." *Nilavar*, 127 Ohio App.3d at 20, 711 N.E.2d 726. Here, the plaintiffs claim that the defendants breached this duty when they excluded the plaintiffs from the Pioneer project. But if there is no enforceable joint-venture agreement, no fiduciary duty is imposed. *See Olympic Holding*, 122 Ohio St.3d 89, 2009-Ohio-2057, 909 N.E.2d 93, at ¶ 46 (holding that a joint-venture agreement unenforceable under the statute of frauds imposes no fiduciary duty). Because there is no enforceable joint-venture agreement here, the defendants are entitled to summary judgment on the claim for breach of fiduciary duty.

{¶ 30} "Unjust enrichment and quantum meruit are doctrines 'derived from the natural law of equity' and share the same essential elements[:] * * * (1) the plaintiff conferred a benefit on the defendant, (2) the defendant knew of the benefit, and (3) it would be unjust to permit the defendant to retain the benefit without payment." *Meyer v. Chieffo*, 193 Ohio App.3d 51, 2011-Ohio-1670, 950 N.E.2d 1027, ¶ 37 (10th Dist.), quoting *Maghie & Savage, Inc. v. P.J. Dick, Inc.*, 10th Dist. Franklin No. 08AP-487, 2009-Ohio-2164, ¶ 33. "The plaintiff must confer the benefit as a response to fraud, misrepresentation, or bad faith on behalf of the defendant." (Citation omitted.) *Superior Piping Contrs., Inc. v. Reilly Industries, Inc.*, 8th Dist. Cuyahoga No. 90751, 2008-Ohio-4858, ¶ 28. Here, there is no evidence of fraud, misrepresentation, or bad faith by the defendants. We note too that work done during negotiations that fail to result in a final agreement is not a circumstance in which it can be deemed unjust to retain a benefit without compensation. *See id.* at ¶ 29-30. The defendants are entitled to summary

judgment on the claims for quantum meruit and unjust enrichment.

**{¶ 31}** " 'The elements essential to recovery for a tortious interference with a business relationship are: (1) a business relationship; (2) the wrongdoer's knowledge thereof; (3) an intentional interference causing a breach or termination of the relationship; and (4) damages resulting therefrom.' " *Kademian v. Marger*, 2d Dist. Montgomery No. 24256, 2012-Ohio-962, ¶ 93, quoting *Wolf v. McCullough-Hyde Memorial Hosp.*, 67 Ohio App.3d 349, 355, 586 N.E.2d 1204 (12th Dist.1990). Here, the plaintiffs do not allege that the defendants induced or otherwise caused A&C or Pioneer to terminate a relationship with them. Instead, the plaintiffs allege that the defendants wrongfully excluded them from the Pioneer project after the parties agreed to build the facility and to form a new entity that would purchase, own, and lease the facility. This agreement, however, was contingent on further negotiations and agreements. The parties' inability to reach further agreements does not constitute tortious interference. "Otherwise, a tortious interference claim could be brought whenever parties engage in business negotiations that ultimately prove unfruitful." *Journal Entry Granting Defendants' Motion for Summary Judgment*, 23 (Nov. 18, 2014). The defendants are entitled to summary judgment on the claim for tortious interference.

**{¶ 32}** "[C]onversion is the wrongful exercise of dominion over property to the exclusion of the rights of the owner * * *." *Joyce v. Gen. Motors Corp.*, 49 Ohio St.3d 93, 96, 551 N.E.2d 172 (1990). Here, the plaintiffs allege that the defendants wrongfully exercised dominion and control over the plaintiffs' business interests. But the parties' inability to reach a final agreement does not constitute any kind of wrongful exercise of dominion. "Otherwise, this claim like the one for tortious interference, could be brought

whenever parties engage in business negotiations that ultimately prove unfruitful." *Journal Entry Granting Defendants' Motion for Summary Judgment*, 23-24 (Nov. 18, 2014). The defendants are entitled to summary judgment on the claim for conversion.

{¶ 33} The seventh assignment of error is overruled.

### III. Conclusion

{¶ 34} We have overruled all of the assignments of error. The trial court's judgment is affirmed.

. . . . . . . . . . . . .

DONOVAN, J., and WELBAUM J., concur.

Copies mailed to:

James Hill
Rick Brunner
Peter Contreras
Hon. James A. Brogan
(sitting for Judge Nick A. Selvaggio)